**UNITED STATES of America,**

v.

**Alfonzo COWARD.**

**No. CRIM. 00–88.**

United States District Court,
E.D. Pennsylvania.

April 10, 2001.

Faithe Moore Taylor, U.S. Attorney's Office, Philadelphia, PA, for U.S.

Jules Epstein, Kairys & Rudovsky, Jeffrey P. Minehart, James J. Di Vergilis, Philadelphia, PA, for Defendants.

Alfonzo Coward, Philadelphia, PA, Pro se.

### MEMORANDUM

DALZELL, District Judge.

We here consider defendant Alfonzo Coward's motion for judgment of acquittal which he has renewed, pursuant to Fed. R.Crim.P. 29(c), after we discharged the jury that convicted him, a previously-convicted felon, of possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Coward's motion raises very serious issues regarding the vitality of gun possession federal jurisprudence that was established before the Supreme Court decisions last year in *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) and *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). These two decisions are sequelae to *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

Given the seriousness of this question, we will consider it here at some length.

*The Charge and the Government's Proof*

On February 22, 2000, a Grand Jury indicted Coward, a previously-convicted felon, of possessing a semi-automatic, operable firearm on September 23, 1998. Referencing 18 U.S.C. § 922(g)(1), the Indictment charged that Coward "knowingly possessed in and affecting interstate commerce, a loaded firearm ... loaded with eighteen rounds of ammunition."

The Government's proof at the March 7, 2001 trial was brief and to the point. At about 9:00 p.m. on September 23, 1998, then-Sergeant Michael Chitwood of the Philadelphia Police Department and his erstwhile partner, Terence Sweeney, heard a radio transmission to all cars patrolling in the 18th Police District to stop a green Subaru with a Pennsylvania license plate identification of BMS 9857. At the time the two officers heard this transmission, their patrol car was at 43rd and Locust Streets, two city streets in West Philadelphia. "Seconds later", they saw a green Subaru pass by on 43rd Street, and, confirming that it had the matching license plate, pulled the Subaru over near the intersection of 43rd and Walnut Streets.

As they parked behind the Subaru, they saw that there was only the driver in the car, who later turned out to be Coward. They saw the driver reach toward the glove compartment and then duck down out of sight for two or three seconds. The officers criss-crossed as they left their patrol car, with Sergeant Chitwood going to the passenger side of the Subaru and Officer Sweeney going to the driver's side. According to the two officers, as Coward got out of the car he said, "It's not mine." When Sergeant Chitwood opened the door on the passenger side, he saw in plain view, only partially under the passenger seat, what turned out to be an operable 9 mm. Smith & Wesson semi-automatic handgun, loaded with eighteen rounds of ammunition.

Coward was taken into custody on a charge of violating the Uniform Firearms Act, and his case was later federalized with the charge under 18 U.S.C. § 922(g)(1), as the firearm in question was at some unknown time manufactured in Springfield,

Massachusetts (its bullets originated in Brazil).

Notable for our analytical purposes here, the Government introduced no evidence at all regarding how the gun got into the Subaru. There was also no evidence regarding the origin or destination of Coward's drive that night. As noted, Coward was alone in the car. There was, therefore, no evidence suggesting any commercial or transactional aspect to Coward's possession of the gun that night, nor any evidence of his intention, say, to drive to an interstate highway such as the nearby Schuylkill or Vine Street Expressways (I–76 and I–676, respectively).

In view of the absence of any commercial or transactional aspect of the case, or regarding any other present interstate dimension to the evidence, Coward, after the Government rested, moved for a judgment of acquittal on the bald possession charge. Although recognizing the gravity of Coward's claim, after examining the issues overnight, and discussing them at length at the charge conference the next morning, we denied the defendant's motion without prejudice to its renewal should the jury find Coward guilty. As it turned out, late on the afternoon of March 8, 2001, the jury did just that, and after we discharged the jury, Coward renewed his motion pursuant to Fed.R.Crim.P. 29(c). We afforded the parties the opportunity to submit detailed briefs on this subject, which they have done.[1]

---

**1.** In his renewed Rule 29 motion after the jury's verdict (though not in his counsel's written version of it), Coward again proffers his motion to suppress the gun, which we denied on January 4, 2001 and reconsidered and reaffirmed on March 5, 2001. On this aspect of the motion, we merely repeat what we held on January 4 in our Order amending the order denying the motion to suppress. There, we stated that although the question is very close, for us the scale tips in favor of sustaining the car stop that was the antecedent of the gun's seizure. We did so because of the long-standing distinction the Supreme Court has made for searches and seizures of automobiles. As the Supreme Court put it in *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), "In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office." As the Supreme Court noted in *Chambers,* this distinction goes back to *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) which recognized "a necessary difference between a search of a store, dwelling house, or other structure" and "a search of a ship, motor boat, wagon, or automobile for contraband goods". *Id.* at 153, 45 S.Ct. 280. *See also Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 221, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968) ("[a]utomobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office.").

The presence of a car in this nighttime stop remains, for us, decisive. The ultimate question in any Fourth Amendment inquiry is, after all, the reasonableness of the search or seizure. Here, there was nothing at all unreasonable in then-Sergeant Chitwood's stop of the green Subaru whose license plate exactly matched that given over police radio only moments before Sergeant Chitwood saw the Subaru. Given the Subaru's mobility under these exigent circumstances, even Coward's former counsel agreed in colloquy with us that it would have been unreasonable to require Sergeant Chitwood effectively to cross-examine police radio as to the basis for the requested stop.

The question then becomes who has the burden of showing that there was no reasonable suspicion behind the police radio request. It seems to us that the Government, having *prima facie* shown the reasonableness of Sergeant Chitwood's behavior, should not have to shoulder the added burden of looking behind the request from police radio. Since the defendant has as much access to this proof as the Government, it seems to us not excessive to place the burden of such proof upon the party claiming that the radio dispatch was illegitimate. As there was not a scintilla of evidence in this record regarding such illegitimacy, we will not infer it retrospectively absent some basis for doing so.

*Analysis*

In order to decide Coward's Rule 29 motion, we will first briefly consider the language of the oddly phrased and punctuated statute that has become such a commonplace in this district as a result of the Government's highly-publicized Operation Ceasefire. We then examine the jurisprudence under § 922(g)(1)'s statutory predecessor, chiefly embodied in the *Bass* and *Scarborough* cases, that has served as the legal predicate for applying the legal fiction of using past interstate transport of a weapon to federalize its present possession. We then outline the historical use of legal fictions, and analyze post-*Lopez* Supreme Court cases to determine the vitality of continued application of the interstate transport legal fiction to possession cases like Coward's. We conclude that the Supreme Court's recent decisions in *Morrison* and *Jones* strongly suggest that this legal fiction no longer deserves any vitality, awaiting only the right case for terminal dispatch.

As will be seen, we believe Coward presents that case.

### A. *The Statute*

The statute under which Coward was indicted and convicted provides, in relevant part:

(g) It shall be unlawful for any person -

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

\* \* \* \* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1). As noted earlier, the specific part of this statute which proved to be the offense of conviction charged that Coward on September 23, 1998 "knowingly possessed in and affecting commerce" the Smith & Wesson semi-automatic weapon and ammunition in it.

Reading the statute, it is apparent that it creates three crimes for convicted felons: (1) "to ship or transport in interstate or foreign commerce ... any firearm or ammunition"; (2) "to ... possess in or affecting commerce, any firearm or ammunition"; and (3) "or to receive any firearm or ammunition which has been . shipped or transported in interstate or foreign commerce." It will be immediately observed that the crimes of (1) shipping or transporting, and (3) receiving any firearm or ammunition "in interstate or foreign commerce" is a crime. Oddly, Congress did not use the locution "in interstate or foreign commerce", when it came to criminalize possession, but merely referred to "in or affecting commerce".

The ordinary dictionary definition of the verb *possess* is "[t]o hold as property; to have belonging to one, as wealth or material objects". XII *The Oxford English Dictionary* 171, def. 2.a (2d ed. 1989). As the *OED* itself notes, the law uses this verb "as distinct from ownership", *id.* at def. 2.b.

With respect to the word *commerce*, it would seem rather clear that it is implied

---

We therefore again hold that the stop of the Subaru was, under all circumstances, reasonable for Fourth Amendment purposes. As it is undisputed that defendant's behavior, as Sergeant Chitwood saw it (and we credit his testimony on this and all points) gave him ample reasonable suspicion to inspect the passenger compartment of the car for his own, and his partner's, protection, the seizure of the semi-automatic 9 millimeter weapon, in plain view, was thus unexceptional under the Fourth Amendment.

after "in" as it is explicitly used after "affecting". This reading stems from the well-established difference between "in commerce" and "affecting commerce". The term "in commerce" is limited to denote "only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974) (construing Clayton Act § 7). As *Jones v. United States, supra,* noted, there is a "recognized distinction between legislation limited to activities 'in commerce' and legislation invoking Congress' full power over activity substantially 'affecting ... commerce.'" 120 S.Ct. at 1911. That is to say, "affecting commerce" invokes Congress's power under the Commerce Clause, "Commerce with foreign Nations, and among the several States, and with the Indian Tribes", Art. I, § 8, cl. 3, and thus the locution "affecting commerce" means that "Congress intended to and did vest ... the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (citations omitted). *See also Russell v. United States*, 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985) ("affecting interstate or foreign commerce" in 18 U.S.C. § 844(i) "expresses an intent by Congress to exercise its full power under the Commerce Clause.").

As a matter of understanding the English language, how can the act of merely holding property ever be "in" or "affecting" such "commerce"? It would be a fair use of the verb *possess* in such a sense if the possession were part of some transactional or commercial use—for example,

holding a gun while inspecting it during a contemplated purchase—and one could imagine such a use distinct from the shipping or transporting or receiving that the statute otherwise criminalizes. But if a gun is held by one alone, say, in a dwelling or in a stopped car or under a bed, can it fairly be understood to involve any "commerce" at all? Absent some transactional or commercial context, it seems paradoxical at best that the static condition of holding property can affect "commerce" or be "in" it.

Our task of parsing through this paradox within this statute is not made any easier by reference to its punctuation. After the disjunctive "or", the statute offers as a complete crime the words, "possess in or affecting commerce, any firearm or ammunition". The statute then closes those words not with a comma, but with a semicolon. The use of the semicolon, rather than a comma, suggests the end of a clause or a completed thought, rather than a pause in an enumeration of related ideas. *See, e.g.,* Wm. Strunk Jr. and E.B. White, *The Elements of Style* 5–6 (3d ed. 1979) ("clauses grammatically complete" joined by semicolons, not commas); H.W. Fowler, *A Dictionary of Modern English Usage* 587–89 (2d ed. 1965) (contrasting commas and semicolons). But it is very difficult to discern how this punctuation helps our understanding of "possess" or of the differences among the three crimes § 922(g)(1) imposes on convicted felons with differing word formulae.

### B. *Judicial Construction of Gun Possession Statutes*

At the time the Supreme Court established what remains the governing jurisprudence on federalization of gun possession, the statute, then codified at 18 U.S.C.

§ 1202(a)[2], was phrased differently.[3] As then-Chief Judge Sloviter has noted, this "predecessor statute to § 922(g)(1)[ ] ... made any felon 'who receives, possesses, or transports in commerce or affecting commerce ... any firearm' guilty of a federal offense." *See United States v. Gateward,* 84 F.3d 670, 671 (3d Cir.1996). The use of commas implied an enumeration of related ideas, *all* modified by the same words, "in commerce or affecting commerce". And this is precisely how the Supreme Court construed the three offenses when it interpreted this predecessor statute.

*United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) construed the former 18 U.S.C. § 1202(a) against a Government contention that the statute "banned all possessions and receipts of firearms by convicted felons, and that no connection with interstate commerce had to be demonstrated in individual cases." *Id.* at 338, 92 S.Ct. at 517. In rejecting the Government's expansive reading, the Court held that "the commerce requirement in § 1202(a) must be read as part of the 'possesses' and 'receives' offenses" and that "[a]bsent a clearer statement of intention from Congress than is present here, we do not interpret § 1202(a) to reach the 'mere possession' of firearms" because "[a]bsent proof of some interstate commerce nexus in each case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction." *Id.* at 350, 92 S.Ct. at 524.

Six years later, the Court construed *Bass* in *Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). After reviewing § 1202(a)'s legislative history, the Court, purely as a matter of statutory construction, held that in order to convict a felon under the statute, the Government only had to prove that "the firearm possessed by the convicted felon traveled at some time in interstate commerce." 431 U.S. at 568, 97 S.Ct. at 1966.

*Scarborough* may fairly be read to establish the legal fiction that has prevailed in these cases since it was announced. This is so even under the present § 922(g)(1). *See Gateward, supra.* Simply phrased, *Scarborough*'s legal fiction is that the transport of a weapon in interstate commerce, however remote in the distant past, gives its present intrastate possession sufficient interstate aspect to fall within the ambit of the statute. This fiction is indelible and lasts as long as the gun can shoot. Thus, a felon who has always kept his father's World War II trophy Luger in his bedroom has the weapon "in" commerce. The question now is whether this legal fiction can survive as a statutory construct in the shadow of the edifice the Supreme Court has built upon *Lopez*'s foundation. Before considering the dimensions of this structure, we briefly

**2.** This statute came into federal law on June 19, 1968, Pub.L. 90–351, Title VII, §§ 1201–1203, 82 Stat. 236. As then-Chief Judge Sloviter explained in her canvass of federal firearms legislation, "the first major federal statute to deal with firearms" was the National Firearms Act of 1934, Pub.L. 474, 48 Stat. 1236, which, interestingly enough, "was enacted under the taxing power." *United States v. Rybar,* 103 F.3d 273, 279 (3d Cir.1996), *cert. denied* 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997).

**3.** The statute was amended and recodified on May 19, 1986 as part of the Firearms Owners' Protection Act, Pub.L. 99–308, § 102(6)(d), 100 Stat. 449. It is not clear how this amendment furthered the Congressional findings stated in § 1(b) which, after mentioning certain protections of the Second, Fourth, Fifth, Ninth, and Tenth Amendments, stated that those rights "require additional legislation to correct existing firearms statutes and enforcement policies".

pause to review the traditional understanding of fictions in our law.[4]

### C. Legal Fictions in Anglo–American Experience

Though it is a large subject, there are, historically speaking, a few noncontroversial aspects of legal fictions that are pertinent to our current inquiry.

As Professor Lon Fuller long ago observed, "a fiction is distinguished from a lie by the fact that it is not intended to deceive." Lon L. Fuller, "Legal Fictions", 25 Ill.L.Rev. 323, 367 (1930). Professor Fuller summarized the meaning of a fiction as "either, (1) a statement propounded with a complete or partial consciousness of its falsity, or (2) a false statement recognized as having utility." *Id.* at 369.

John Chipman Gray recorded that fictions go back as far as the time of Roman law, and came to play an important part in the administration of law in England. Interestingly, and rather to the point of Coward's case, Gray characterized fictions in England as having a "bolder" and "more brutal" aspect as compared with their Roman antecedents, in that "[i]n England the plaintiff alleged a fact which was false, and the courts did not allow the defendant to contradict it." John Chipman Gray, *Nature and Sources of the Law* 32 (2d ed. 1921). Gray later cited an example that is relevant to the *Scarborough* fiction:

> The most grotesque of these fictions was that by which, for the purpose of giving a remedy in England for a wrong done in the Mediterranean, it was alleged that the Island of Minorca was at London, in the parish of St. Mary Le Bow in the Ward of Cheap. . . .

*Id.* at 34.

From the time of Blackstone, however, the "brutality" that Gray observed was leavened by the liberality of certain maxims. As Blackstone observed,

> [T]hese fictions of law, though at first they may startle the student, he will find upon further consideration to be highly beneficial and useful; especially as this maxim is ever invariably observed, that no fiction shall extend to work an injury; its proper operation being to prevent a mischief, or remedy an inconvenience, that might result from the general rule of law. . . . So true it is, that *in fictione juris semper subsistit aequitas.*

III William Blackstone, *Commentaries on the Laws of England* *43, reproduced in William Draper Lewis ed. at 1056 (1897). The Latin maxim that Sir William Blackstone quotes means, "in the fiction of law there is always equity; a legal fiction is always consistent with equity." *Black's Law Dictionary* 778 (6th ed. 1990).

It is difficult to reconcile these maxims of lenity and equity with the harshness imposed under the *Scarborough* fiction.[5] Indeed, the fiction's post-*Scarborough* application rather fits the cynical definition of a fiction that Fuller disapprovingly quotes, "a device for attaining desired legal consequences or avoiding undesired legal consequences." Fuller at 531 (1931) (quoting Mitchell, "The Fictions of Law", 7 Harv.L.Rev. 249, 253 (1893)). Harsh though the *Scarborough* fiction may be, especially as measured against these ancient maxims, justices have unquestioned power to impose such "brutal" fictions,

---

**4.** In its Memorandum of Law, the Government notably does not contest that *Scarborough* creates a legal fiction, but merely argues that it "met that burden in this case" by showing historical interstate movement, a point that no one disputes. *See* Gov't Mem. of Law at 8.

**5.** Coward could well be forgiven if he choked a bit on reading Blackstone's maxims.

albeit within their view of the Constitution's limits.

### D. *The Status of the Scarborough Fiction Today*

We now come to *Lopez*. As had been widely rehearsed, *Lopez* held that the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime knowingly to possess a firearm in a school zone, exceeded Congress's authority under the Commerce Clause. *See* 514 U.S. at 551, 115 S.Ct. 1624. The Court stressed that Article I, § 8 of the Constitution gave Congress enumerated, and therefore limited, powers, particularly as against the antecedent powers of the states, and that an expansive construction of the Commerce Clause would effectively read out those limitations. The Court noted that § 922(q) was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561, 115 S.Ct. 1624.

The Court in *Lopez* also observed that the legislative history of § 922(q) did not contain "express Congressional findings regarding the effects upon interstate commerce of gun possession in a school zone", *id.* at 562, 115 S.Ct. 1624. It also noted that the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.*

The initial response in the Courts of Appeals to *Lopez* was divided, as rather well exemplified in our own Court of Appeals's decision in *United States v. Bishop,* 66 F.3d 569 (3d Cir.1995), which considered the constitutionality of the federal carjacking statute and which was an-

nounced less than five months after *Lopez* was decided. The majority, in an opinion by then-Judge Lewis, stated that "despite protestations to the contrary, the winds have not shifted that much." *Id.* at 590, 115 S.Ct. 1624. By contrast, Judge Becker, concurring in part and dissenting in part, at length concluded that *"Lopez* is not just another Supreme Court case, but a watershed." *Id.* at 603, 115 S.Ct. 1624 (concurring and dissenting opinion). Time has surely shown that Judge Becker's view was the more prescient.

A year after *Lopez*, however, our Court of Appeals had occasion to consider its significance to § 922(g). In *United States v. Gateward, supra,* the panel, in an opinion by then-Chief Judge Sloviter, stated that it did "not understand *Lopez* to undercut the *Bass* /*Scarborough* proposition that the jurisdictional element 'in or affecting commerce' keeps the felon firearm law well inside the constitutional fringes." 84 F.3d at 671. Chief Judge Sloviter went on to write that:

> The *Lopez* Court invalidated § 922(q) because "by its terms [it] has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms," and because "§ 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."

*Id.* at 671–72 (citation omitted). The *Gateward* panel, noting that the gun in question "had moved in interstate commerce", applied the *Scarborough* fiction to affirm the conviction.

At the barest minimum, the Supreme Court's Commerce Clause jurisprudence in criminal cases since *Lopez* calls for a reexamination of *Gateward*'s brief analysis.[6]

---

**6.** As will be seen, the Government's conten-

tion that this post-*Gateward* jurisprudence

For example, we now know that the "economic effect" aspect, and even Congressional findings regarding such economic effects, will not serve under the Commerce Clause to save a criminal statute where no economic activity is in commercial reality involved. This is the holding in *United States v. Morrison, supra,* which invalidated 42 U.S.C. § 13981, a statute that federalized "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). For our purposes, *Morrison*'s understanding of *Lopez* is what is of greatest interest.

Although acknowledging *Lopez*'s statement that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce", *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624 (citing, *e.g., Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)), *Morrison* stressed that:

> ... a fair reading of *Lopez* shows that the non-economic criminal nature of the conduct at issue was central to our decision in that case.

120 S.Ct. at 1750. *Morrison* further explained that:

> *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor.

*Id. Morrison* concluded that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Id.* at 1751. *Morrison* thus read out the "costs of crime" and economic "effects" that Congress was at pains to canvass in the extensive legislative history of the Violence Against Women Act of 1994:

> Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. See *Lopez, supra,* at 564, 115 S.Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption.

*Id.* at 1752–53.

Having withdrawn these economic effects as a Commerce Clause prop[7], *Mor-*

---

does not "work[ ] any fundamental change on the law controlling this case", Gov't Mem. of Law at 11, is unconvincing in view of the breadth of *Morrison* 's dispatch of the economic effect idea that had been previously thought in cases like *Gateward* and *Rybar* to suffice as a Commerce Clause prop.

**7.** After *Gateward,* but before *Morrison,* a panel of our Court of Appeals decided *United States v. Rodia,* 194 F.3d 465 (3d Cir.1999), *cert.*

denied 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). *Rodia* held that 18 U.S.C. § 2252(a)(4)(B), which imposes criminal liability on anyone possessing child pornography that has itself traveled in interstate commerce, nevertheless passed Commerce Clause muster. The panel did so because "Congress rationally could have believed that intrastate possession of pornography has substantial effects on interstate commerce." *Id.* at 468; see also discussion of *Wickard* and its

*rison* left a single reed to support the continued vitality of *Gateward*, *i.e.*, the statutory jurisdictional element "in or affecting commerce" that is the *Scarborough* fiction. That reed, however, had only one more week of life.

On May 22, 2000, seven days after *Morrison* was announced, the Supreme Court rendered its decision in *Jones v. United States, supra*. *Jones* construed 18 U.S.C. § 844(i), which explicitly *has* a jurisdictional element within it. Specifically, that statute makes it a federal crime to damage or destroy, "by means of fire or an explosive, any ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." [8]

Dewey Jones on February 23, 1998 "tossed a Molotov cocktail through a window into a home in Ft. Wayne, Indiana, owned and occupied by his cousin." 120 S.Ct. at 1908. Jones was indicted and convicted of this federal arson charge, and the Seventh Circuit affirmed his conviction, 178 F.3d 479 (7th Cir.1999). The Supreme Court granted certiorari, 528 U.S. 1002, 120 S.Ct. 494, 145 L.Ed.2d 381 (1999), and framed as the question presented:

> Whether, in light of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and the interpretive

rule that constitutionally doubtful constructions should be avoided, see *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), 18 U.S.C. § 844(i) applies to the arson of a private residence; and if so, whether its application to the private residence in the present case is constitutional.

120 S.Ct. at 1908–09 (some internal citations omitted).

In the Supreme Court, the Government argued that the Ft. Wayne residence was indeed "used" in at least three activities "affecting commerce": (1) the house was "collateral to obtain and secure a mortgage from an Oklahoma lender"; (2) the homeowner insured the residence with "a casualty insurance policy from a Wisconsin insurer"; and (3) the dwelling received "natural gas from sources outside Indiana". *Id.* at 1910.[9] Justice Ginsburg responded with the observation that "[w]ere we to adopt the Government's expansive interpretation of § 844(i), hardly a building in the land would fall outside the federal statute's domain." *Id.* at 1911. Importantly for our present analysis, and particularly striking when one recalls that

---

progeny at 475–77. *See also Rybar*, 103 F.3d at 283 (analyzing and applying *Wickard*). Oddly, a post-*Morrison* panel of our Court of Appeals in *United States v. Galo*, 239 F.3d 572 (3d Cir.2001) approvingly considered and applied *Rodia*, see id., 239 F.3d at 575–76, without any citation of *Morrison*'s holding that giving such an "attenuated effect" Commerce Clause efficacy "would allow Congress to regulate any crime as long as the nationwide, aggravated impact of that crime has substantial effects on employment, production, transit, or consumption." *Morrison*, 120 S.Ct. at 1752–53.

8. It is true, as the Government points out, that § 922(g) does not employ the verb *use*

before the locution "in or affecting commerce." *See* Gov't Mem. of Law at 13. In view of our assumption, noted above, that Congress intended to assert its maximal Commerce Clause power when it chose the "affecting commerce" language, *see, e.g., NLRB v. Reliance Fuel Oil Corp.*, cited and quoted *supra* note 7, the presence or absence of *use* is of no moment to the *Wickard*-free analysis required after *Morrison*.

9. It is worth noting that in *Rodia*, discussed *supra* note 7, the sole evidence of interstate movement was Polaroid film, not manufactured in New Jersey (where the defendant was) and therefore necessarily transported "via interstate commerce." 194 F.3d at 469.

Justice Ginsburg was a *Lopez* dissenter, she wrote for the Court:

> Given the concerns brought to the fore in *Lopez,* it is appropriate to avoid the constitutional question that would arise were we to read § 844(i) to render the "traditionally local criminal conduct" in which petitioner Jones engaged "a matter for federal enforcement."

*Id.* at 1912. Ironically, the language Justice Ginsburg chose to quote came from *Bass,* 404 U.S. at 350, 92 S.Ct. 515. Three sentences later, she again quoted *Bass* when she wrote for the Court, "We have cautioned, as well, that 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Id.* (quoting *Bass,* 404 U.S. at 349, 92 S.Ct. 515).

Thus, to avoid *Lopez* concerns, as well as to maintain "the federal-state balance" as a matter of statutory construction,[10] the Supreme Court held that the statute "covers only property currently used in commerce or in an activity affecting commerce." *Id.* at 1912. In so holding, although without explicitly saying so, the Supreme Court did not extend a *Scarborough*-like fiction to home ownership, as the Government invited it to do.

For precisely the same reasons *Jones* enunciated, § 922(g)(1) should no longer

be read with the *Scarborough* fiction. That is to say, the Supreme Court's use in *Jones* of "currently used in commerce or in an activity affecting commerce" negates a fiction that allows the past to become the present. Such a statutory reconstruction also avoids *Lopez-Morrison* implications if it applies only to guns and ammunition "currently used in commerce or in an activity affecting commerce". In short, abandoning the *Scarborough* fiction allows the present to be "current", unencumbered by the past.

We therefore apply § 922(g)(1) to a possession case in a way that we believe is faithful to *Lopez* and *Morrison* and allows *Jones* to inform the possessory prong of the three crimes § 922(g)(1) creates. We do no more than this.[11]

On this record, Coward's possession of the gun was neither "used in commerce" nor did it have any present or imminent interstate aspect. It had no commercial or transactional context. His conviction therefore should not stand, as he committed no federal crime.

We are mindful, however, of the Supreme Court's admonition in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), where the Court cautioned:

---

**10.** Pertinent to § 922(g)(1), there is pervasive state law proscribing felon gun possession, and indeed regulating gun possession in general. *See, e.g.,* 18 Pa. Cons.Stat.Ann. § 6105(a) (2000) (criminalizing felon gun possession). *See also* Stephen P. Halbrook, *Firearms Law Deskbook* (West 1999) (collecting state firearms-related statutes).

**11.** *Our holding is thus considerably narrower than recent decisions of Courts of Appeals to the effect that, even after* Morrison *and* Jones, *§ 922(g) "is properly within Congress's authority under the Commerce Clause." See, e.g., United States v. Santiago,* 238 F.3d 213,

217 (2d Cir.2001). *Under our analysis, we readily agree that federalizing shipping, transporting, and receipt of firearms are all well within that authority, and that federalizing possession often can be. There remain possession cases, however, like Coward's, where the* Jones *avoidance of a* Scarborough-*type fiction also avoids a serious constitutional issue. We therefore do not accept the Government's breathless* in terrorem *that our narrow holding "would open the floodgates for innumerable 2255 motions." Gov't Mem. of Law at 14–15.*

If a precedent of this Court *has direct application in a case,* yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which *directly controls,* leaving to this Court the prerogative of overruling its own decisions.

490 U.S. at 44, 109 S.Ct. 1597 (emphasis added). *See also United States v. Bishop,* 66 F.3d 569, 595 n. 13 (3d Cir.1995) (opinion of Becker, J.). As applied here, we must respect not only *Scarborough,* but also *Gateward* and *Rodia.* We therefore will deny Coward's motion, in the expectation of a reversal.

### ORDER

AND NOW, this 10th day of April, 2001, upon consideration of defendant's motion for relief under Rule 29 (docket no. 74) and his *pro se* motion for extension of time of thirty days to file a motion for new trial and other motions (docket no. 76), and the Court having in the accompanying Memorandum considered both motions, and for the reasons set forth in that Memorandum, it is hereby ORDERED that the motions are DENIED.