**FREEDOM BAPTIST CHURCH OF DELAWARE COUNTY and Chris Keay, Pastor,**

v.

**TOWNSHIP OF MIDDLETOWN, et al.**

**No. CIV.A. 01–5345.**

United States District Court, E.D. Pennsylvania.

May 8, 2002.

---

**6.** Given our ruling, there is no need to address the Equitable Estoppel argument raised by the Plaintiffs.

858

L. Theodore Hoppe, Jr., Shields & Hoppe, LLP, Median, PA, Anthony R. Picarello, Jr. (argued), The Becket Fund for Religious Liberty, Washington, DC, for plaintiffs.

Jennifer L. Holsten–Maddaloni (argued), Holsten and Associates, Media, PA, for defendants.

James D. Todd, Jr. (argued), U.S. Dept. of Justice, Civ. Div., Federal Programs Branch, Washington, DC, for intervener-Government.

### MEMORANDUM

DALZELL, District Judge.

On September 22, 2000, the President signed the Religious Land Use and Institutionalized Persons Act of 2000, Pub.L. No. 106–274, 114 Stat. 803–807, codified at 42 U.S.C. §§ 2000cc–2000cc–5 (hereinafter the "RLUIPA"), which Congress enacted in order "[t]o protect religious liberty, and for other purposes." Freedom Baptist Church of Delaware County and its Pastor, Chris Keay, invoke this new statute against the Township of Middletown, Delaware County, and its Zoning Hearing Board because of land use restrictions that plaintiffs claim run afoul of the RLUIPA and 42 U.S.C. § 1983.

The Township[1] has filed a motion to dismiss which, among other things, asserts that the RLUIPA is unconstitutional on its face. Pursuant to 28 U.S.C. § 2403(a), the United States of America moved to intervene in order to defend the statute. On February 25, 2002, we granted the Government's unopposed motion, and later granted its request for oral argument on this important question, which we held on April 26, 2002.

---

1. In referring to the "Township", we use a shorthand for all defendants, who include the members of the Township of Middletown Council and the Township's Zoning Hearing Board, as well as John T. McKeown, the Township's Zoning Officer.

After extensive briefing, including our receipt of post-argument memoranda dealing with the Establishment Clause issue first raised in the Township's reply brief, we turn now to consider at length the constitutionality of the RLUIPA.

*Background*

According to the complaint, Freedom Baptist Church is a non-denominational congregation of about twenty-five members. Under Pastor Chris Keay, this new assembly has been worshipping and holding services in Delaware County, Pennsylvania since late in 2000, and has attempted to make Middletown Township its home.

When the Church learned that space was available in an office building at 594 New Middletown Road in Middletown Township that D.R. Real Estate LLC owned, it entered into a lease for the use of half of the first floor of the building, reserving for itself a right of first refusal to rent the second half of the first floor. *See* Compl. ¶¶ 33, 37. Besides holding Sunday worship services from 8:00 a.m. to 1:00 p.m. and 5:00 p.m. to 7:30 p.m., the Church holds services from 6:30 p.m. to 9:30 p.m. on Wednesdays of each week. *Id.* at ¶ 34.

On April 5, 2001, defendant Jack McKeown, the Township Zoning Officer, advised one of the owners of the building that the Church's use of the property violated the Township zoning ordinances. *Id.* at ¶ 41. "Mr. McKeown directed that the use of the property for worship services cease." *Id.* at ¶ 45. After a hearing on the Church's application for a use variance, the Middletown Zoning Hearing Board allegedly denied that application, and this resulted in an appeal to the Court of Common Pleas of Delaware County, Pennsylvania. *Id.* at ¶ 47. Last month, we learned that the appeal in the Court of Common Pleas had been settled in early 2002, and that the application was granted, albeit subject to two conditions regarding times

of use of the building and arrangements with an adjacent funeral home for overflow parking.

The Church alleges that the Township's zoning ordinance creates seventeen districts, but none "where religious worship is a permitted use." *Id.* at ¶¶ 48–49. In those districts where religious worship is an allowed use, it is claimed to be a "conditional use and is subject to onerous requirements, i.e., there must be a minimum lot of five (5) acres as well as parking requirements", *id.* at ¶ 50, and the "land requirement alone would make it next to impossible for a new church to locate within the Township" because such a parcel "within the Township would be prohibitively expensive and it is also unlikely that there would be available land to meet the requirement." *Id.* at ¶ 51. The Church then contends that the zoning ordinance treats schools less onerously than churches, *id.* at ¶¶ 54–57, and that the zoning ordinance has the effect of "shutting out any religious group from locating within the Township", *id.* at ¶ 60.

The first four counts of plaintiffs' complaint assert claims under the RLUIPA, specifically that the Township is discriminating on the basis of religion (Count I), treating the Church "on less than equal terms as a nonreligious assembly or institution" (Count II), placing a substantial burden on their religious exercise (Count III), and "imposing and implementing land use regulations that unreasonably limit religious assemblies within a jurisdiction" (Count IV). Count V asserts that plaintiffs' First Amendment free exercise rights have been deprived, in violation of 42 U.S.C. § 1983. Counts VI, VIII, X, XII and XIV assert violations of rights under the Pennsylvania Constitution. Counts VII, IX, XI and XIII assert § 1983 claims for violations of plaintiffs' freedom of speech, assembly, equal protection and due

process rights under the United States Constitution, as applied to the states through the Fourteenth Amendment.

Although plaintiffs have made claims under § 1983 and other sources of law, all parties agreed at the April 26, 2002 oral argument that the RLUIPA constitutionality question is at the heart of this case and involves "a controlling question of law" within the meaning of 28 U.S.C. § 1292(b).[2]

*The RLUIPA*

As noted at the outset, the RLUIPA became law on September 22, 2000. There is little dispute that it was adopted in response to the Supreme Court's partial invalidation in 1997 of the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U.S.C. §§ 2000bb–2000bb–4, in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Of particular concern here is § 2 of P.L. 106–274, now codified at 42 U.S.C. § 2000cc.

This section deals with "protection of land use as religious exercise" and establishes in subsection (a)(1) a "general rule" that:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

Notwithstanding the breadth of this "general rule", subsection (a)(2) immediately limits the applicability of the statute to:

any case in which—

(A) the substantial burden is imposed in a program or activity that receives Fed-

---

**2.** In advance of the oral argument, we ordered plaintiffs to address the issues of mootness and standing in light of the settlement of their appeal in the Court of Common Pleas of Delaware County. In response, defendant transmitted a letter which, in relevant part, stated:

Even though the variance was ultimately granted, Plaintiffs still had to incur the cost of seeking the variance—a cost that is not imposed on otherwise similar, nonreligious uses, and that the Defendant[s] have not remedied. Plaintiffs are also entitled to receive compensatory damages for their actual injuries other than the out-of-pocket costs of the Defendants['] differential treatment. As a church that is just getting started, Freedom Baptist Church was looking for stability and a place to call home. They had already had to leave one location and had a difficult time finding this new one. The uncertainty concerning their ability to stay at the property has caused the Church and its members anxiety and distress. Furthermore, the Township's actions delayed the Church's ability to make long term plans and plan for the future. These are compensable injuries.

Ltr. from L. Theodore Hoppe, Jr. to the Court (Apr. 25, 2002) at 2.

In the same letter, counsel notes that "there continues to be a real controversy with the threat of immediate and real harm" because defendants allegedly "are applying the existing zoning ordinances ... on less than equal terms with comparable nonreligious uses" against plaintiffs. *Id.*

At a minimum, it would appear under *Los Angeles v. Lyons*, 461 U.S. 95, 107–13, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) and *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), that plaintiffs' damage claims have not been mooted, and they therefore continue to have standing, at a minimum, to pursue those damage claims. In the words of *Wright*, those two plaintiffs "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.*, citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). We need not, at this procedural juncture, decide whether plaintiffs are entitled to any other relief than damages.

eral financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

So limited, the statute then, in subsection (b), imposes four proscriptions:

(b) DISCRIMINATION AND EXCLUSION—

(1) EQUAL TERMS.—No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) NONDISCRIMINATION.—No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) EXCLUSIONS AND LIMITS.—No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

Section 4 of P.L. 106–274, now codified at 42 U.S.C. § 2000cc–2, confers a "cause of action" to aggrieved persons "in a judicial proceeding [to] obtain appropriate relief against a government", and specifically asserts that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." The statute also, at § 7 of P.L. 106–274, amends certain sections of the Religious Freedom Restoration Act of 1993 (the "RFRA") that survived *City of Boerne*.[3]

As noted, there is really no doubt that the RLUIPA is the result of the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). As the House Report on H.R. 1691, the Religious Liberty Protection Act of 1999, a legislative predecessor of the RLUIPA, put it, "H.R. 1691 was introduced in part in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act ... which itself was enacted in 1993 in response to an earlier court decision", to wit, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). H.R. 106–219, at 4 (1999). It is apparent that, as the legislative process went on, the bill shrank until it reached the form of S.2869, which is the text of our present law. Indeed, one of the co-sponsors of S.2869, Senator Hatch, expressed his frustration in this respect on the Senate floor when he said:

It is no secret that I would have preferred a broader bill than the one before us today. Recognizing, however, the hurdles facing passage of such a bill, supporters have correctly, in my view,

---

**3.** Although *City of Boerne* held that the RFRA could not constitutionally apply to the states, the Court did not address the statute's federal dimensions. To date, Court of Appeals panels have held that the RFRA remains effective as to the federal government. *See, e.g., Kikumura v. Hurley*, 242 F.3d 950, 959–60 (10th Cir. 2001).

agreed to move forward on this more limited, albeit critical, effort.

146 Cong. Rec. S7774–01 (Jul. 27, 2000) (remarks of Sen. Hatch).

In their Joint Statement, Senators Hatch and Kennedy, S.2869's co-sponsors, noted that the bill in question "is based on three years of hearings—three hearings before the Senate Committee on the Judiciary and six before the House Subcommittee on the Constitution—that addressed in great detail both the need for legislation and the scope of Congressional power to enact such legislation." *See, id.,* Ex. 1, Joint Statement of Sen. Hatch and Sen. Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000 (hereinafter the "Joint Statement"). According to the co-sponsors:

> . . . The right to build, buy, or rent such a space [for churches and synagogues] is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.
>
> The hearing record compiled massive evidence that this right is frequently violated. Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.

*Id.*

The Joint Statement was also at pains to canvass Congress's constitutional authority in this area; as its authors put it, "The hearings also intensely examined Congress's constitutional authority to enact this bill in light of recent developments in Supreme Court federalism doctrine." *Id.* at S7775. Specifically, Congress identified its authority under the Spending[4] and Commerce[5] Clauses, as well as the Fourteenth Amendment in enforcing "the Free Exercise and Free Speech Clauses as interpreted by the Supreme Court."[6] *Id.* The Joint Statement then noted that:

> Congress may act to enforce the Constitution when it has "reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne v. Flores,* 521 U.S. 507, 532, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The standard is not certainty, but "reason to believe" and "significant likelihood."

*Id.*

The Joint Statement then at some length canvassed the hearing record which, it said, "demonstrates a widespread practice of individualized decisions to grant or refuse permission to use property for religious purposes", and that such "individ-

---

**4.** That is, Congress's power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1. *See South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

**5.** That is, Congress's power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. *See United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

**6.** That is, the rights that are applied to the states through the Fourteenth Amendment and enforced through § 5 of that amendment, which provides, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." *See City of Boerne,* 521 U.S. at 516–17, 117 S.Ct. 2157.

ualized assessments readily lend themselves to discrimination," but also by their nature "make it difficult to prove discrimination in any individual case." *Id.* Thus, echoing the Supreme Court's standard in *City of Boerne v. Flores,* the co-sponsors concluded that the "general rules" quoted above from § (a)(1) and the specific provisions in § (b) constitute "proportionate and congruent responses to the problems documented in this factual record." Joint Statement.

Defendants' motion to dismiss requires us to test whether Congress has, indeed, conformed this legislation with the Supreme Court's rapidly-evolving federalism jurisprudence of recent years. Indeed, as will be seen, there is a great deal of constitutional architecture that we must consider as we analyze the structure of this seemingly simple statute.

This case illustrates that the RLUIPA reaches down to what has traditionally been a matter of almost exclusively local concern, the enforcement of zoning codes. As far as we are aware, this is the first case to test this aspect of the RLUIPA.[7]

*Is This an Establishment or a Free Exercise Case?*

In their memorandum of law filed in response to the Government's memorandum in support of the RLUIPA's constitutionality, defendants for the first time urge that "[w]hat the RLUIPA actually does is violate the Establishment Clause." Defs.' Mem. of Law in Opp. to the Constitutionality of the Religious Land Use and Institutionalized Persons Act of 2000 ("Reply") at 2. Defendants of course refer to the first ten words of the First Amendment, "Congress shall make no law respecting an establishment of religion". Specifically, defendants contend that:

> The RLUIPA impermissibly advances religion. RLUIPA clearly shows favoritism for those in a religious organization over those who are not part of one. RLUIPA is not an example of Congress' intent to provide "religious protection." To the contrary, it represents congressional intent for a "religious preference." The RLUIPA arms religious entities with almost blanket immunity from land use requirements, while providing no such immunity or protection to non-religious entities. This favoritism violates the Establishment Clause[.]

Reply at 2.

In making this tersely-advanced argument, defendants are in good company. Justice Stevens in his concurring opinion in *City of Boerne* expressed the same view regarding the RLUIPA's predecessor, the RFRA. As his concurring opinion in *City of Boerne* is as pithy as defendants' reply memorandum on this point, we quote it in full:

---

7. *Mayweathers v. Terhune,* No. Civ. S–96–1582 LKK/GGH P, 2001 U.S. Distr. LEXIS 22300, 2001 WL 804140 (E.D.Cal. Jul. 2, 2001), *aff'd sub nom. Mayweathers v. Newland,* 258 F.3d 930 (9th Cir.2001), upheld the statute's constitutionality in a class action of Muslim state prisoners, and did so primarily on Spending Clause grounds not applicable here. *See id.* at *2–5, 2001 WL 804140 at *1–2. Another prisoner case, *Johnson v. Martin,* Case No. 2:00–cv–075, is pending in the United States District Court for the Western District of Michigan, Northern Division, and on April 16, 2002, Magistrate Judge Timothy P. Greeley, largely following *Mayweathers,* issued a Report and Recommendation upholding the RLUIPA under the Spending Clause.

There are two reported decisions to date that have to do with the land use provisions of the RLUIPA, but both dealt with the statute's applicability and not with its constitutionality. *See Dilaura v. Ann Arbor Charter Township,* No. 00–1846, 2002 U.S.App. LEXIS 3135, 2002 WL 273774 (6th Cir. Feb. 25, 2002) (not for full-text publication); and *Murphy v. Zoning Comm'n of Town of New Milford,* 148 F.Supp.2d 173 (D.Conn.2001).

In my opinion, the Religious Freedom Restoration Act of 1993 (RFRA) is a "law respecting an establishment of religion" that violates the First Amendment to the Constitution.

If the historic landmark on the hill in Boerne happened to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure. Because the landmark is owned by the Catholic Church, it is claimed that RFRA gives its owner a federal statutory entitlement to an exemption from a generally applicable, neutral civil law. Whether the Church would actually prevail under the statute or not, the statute has provided the Church with a legal weapon that no atheist or agnostic can obtain. This governmental preference for religion, as opposed to irreligion, is forbidden by the First Amendment. *Wallace v. Jaffree,* 472 U.S. 38, 52–55, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

*City of Boerne,* 521 U.S. at 536–37, 117 S.Ct. 2157 (Stevens, J., concurring).

With all deference to Justice Stevens's views, it has not escaped our attention that his concurrence was only for himself. Indeed, neither Justice Kennedy's opinion for the Court, nor Justice Scalia's concurrence (which Justice Stevens joined), nor Justice O'Connor's dissent (much of which Justice Breyer joined), nor Justice Breyer's dissent, mentions a word about the Establishment Clause. This is particularly notable since (a) Justice Stevens threw the issue into bold relief, and (b) the RFRA was, as all agree, a much broader statute than the RLUIPA.

To the contrary, what all justices except Justice Stevens saw in *City of Boerne* was a Free Exercise case, and the legal artillery of the other concurrer and the dissenters was trained on whether *Smith* was properly decided. To take just two examples[8], Justice Souter stated:

> I have serious doubts about the precedential value of the *Smith* rule and its entitlement to adherence. These doubts are intensified today by the historical arguments going to the original understanding of the Free Exercise Clause presented in JUSTICE O'CONNOR's opinion, *ante,* at 5–21, which raises very substantial issues about the soundness of the *Smith* rule.

*Id.* at 565, 117 S.Ct. 2157 (Souter, J., dissenting).

Justice Breyer began his brief dissent with the statement that:

> I agree with JUSTICE O'CONNOR that the Court should direct the parties to brief the question whether *Employment Div. Dept. of Human Resources of Ore. v. Smith* was correctly decided, and set this case for reargument.

*Id.* at 566, 117 S.Ct. 2157 (Breyer, J., dissenting) (citations omitted).

Indeed, as suggested *supra* at note 3, post-*City of Boerne* appellate jurisprudence has uniformly held that the RFRA remains effective as to the federal government. *See Kikumura v. Hurley,* 242 F.3d at 959–60; *see also Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 833 (9th Cir.1999); *In re Young,* 141 F.3d 854, 861 (8th Cir.1998), *cert. denied,* 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998). These Court of Appeals decisions are unsurprising in view of the absence in *City of*

---

**8.** Justice Scalia's concurrence was addressed entirely to Justice O'Connor's claim that "historical materials" do not support *Smith's* reading of the Free Exercise Clause. After an exhaustive survey of the historical record, Jus-

tice Scalia concluded that "[t]he historical evidence put forward by the dissent does nothing to undermine the conclusion we reached in *Smith*". *Id.* at 544, 110 S.Ct. 1595 (Scalia, J., concurring).

*Boerne* of any suggestion, other than from Justice Stevens, as to the Establishment Clause implications of the RFRA. Put another way, if the RFRA were constitutionally infirm on Establishment Clause grounds as to the states, there would be no principled way to exempt the national government from the same infirmity.

Our reading of the RFRA on the Establishment Clause question necessarily applies to the RLUIPA. The later statute on its face concerns itself with Free Exercise. In § (a)(1)'s "general rule", Congress in the first operative words of the Public Law provides, "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden *on the religious exercise* of a person, including a religious assembly or institution...." 42 U.S.C. § 2000cc(a)(1) (emphasis added). As this language of the RLUIPA is a cognate of a parallel locution in the RFRA (to wit, "Government shall

not substantially burden a person's exercise of religion", 42 U.S.C. § 2000bb–1(a)), we believe that *City of Boerne* confirms that what we have here is a Free Exercise case, and not an Establishment Clause case.

We therefore need not subject the RLUIPA to the rigor of the three-part test that *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), ordained.[9] With the exception of the Commerce Clause question immediately next considered, we will thus analyze the RLUIPA against the Free Exercise and Fourteenth Amendment § 5 standards that eight justices considered in *City of Boerne.*

*The RLUIPA and the Commerce Clause* [10]

█ In their memorandum at 6–9, and in their reply memorandum at § IV, defendants contend that Congress exceeded its authority under the Commerce Clause when it adopted the RLUIPA. Both at

**9.** The Eighth Circuit in *In re Young,* 141 F.3d at 861–63, subjected the RFRA's federal aspect to the *Lemon* test, and had no difficulty concluding that it passed.

We also agree with the Government's view, expressed in its post-argument supplemental memorandum, that "the Supreme Court has repeatedly stated that government may legislatively accommodate religious exercise consistent with the Establishment Clause." Gov't Supp. Mem. of Law at 2. *See, e.g., Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("Our cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice."). Indeed, the Supreme Court's decision in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), constitutes something of a silver bullet against any residual Establishment Clause concerns. *Amos* upheld, against an Establishment Clause challenge, § 702 of the Civil Rights Act of 1964, which exempted religious organi-

zations from Title VII's prohibition against discrimination in employment on the basis of religion, and found that the prohibition did not impermissibly favor religion. *Id.* at 334–40, 107 S.Ct. 2862.

We also note in passing that we are puzzled by Justice Stevens's citation to *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), which challenged the constitutionality of an Alabama school prayer and meditation statute, an issue we should think is rather far afield from the concerns of either the RFRA or the RLUIPA.

**10.** As noted *supra* at note 4 and accompanying text, Congress identified its Spending Clause authority under art. I, § 8, cl. 1 as its first source of power to adopt the RLUIPA. Indeed, this power is the obvious source for § (a)(2)(A) of the statute, which provides that "This subsection applies in any case in which—(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance...." As no one claims that there is any such federally-assisted "program or activity" here, we do not consider this part of the RLUIPA any further.

oral argument and in their briefing, defendants stress that religious institutions "have virtually no effect on interstate commerce", Defs.' Mem. L. in Supp. Mot. to Dismiss at 8, and thus Congress could not seriously invoke Commerce Clause authority to regulate something that defendants regard, and not without reason, as the antithesis of commerce.

Indeed, the Government in its memorandum takes the threshold position that, as "there does not appear to be any allegation in their Complaint that the alleged burden on plaintiffs' religious exercise affects commerce, or that the removal of such burden would affect commerce," Gov't Mem. L. at 26, we should decline to address the Commerce Clause question.

Both in their memorandum in opposition and at oral argument, however, plaintiffs counter that we should address the issue because the rental of property and use and development of land substantially affect interstate commerce, *citing, e.g., Groome Resources Ltd. v. Parish of Jefferson,* 234 F.3d 192, 205–06 (5th Cir.2000) (upholding the constitutionality of the Fair Housing Amendments Act, and noting that "an act of discrimination that directly interferes with a commercial transaction," such as the purchase, sale or rental of residential property, "is an act that can be regulated to facilitate economic activity"). *See also Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 295–99, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (holding that a religious foundation is an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the Fair Labor Standards Act).

As noted in our canvass of the statute, subsection (a)(2)(B) applies to cases where the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability.

In essence, plaintiffs contend that the zoning condition on their lease of property in Middletown, and associated parking requirements, constitute a substantial burden on them, and therefore the commerce aspect of the RLUIPA is triggered. On a motion to dismiss, where we read a complaint liberally in favor of the plaintiff,[11] we will accept this reading of the controversy, and therefore decline the Government's suggestion that we should avoid a ruling on this part of the statute.

At least in its Commerce Clause dimension, it would seem that Congress's power over economic activity remains extraordinarily broad. As we last year canvassed the jurisprudence in a criminal context in *United States v. Coward,* 151 F.Supp.2d 544, 551–54 (E.D.Pa.2001), the Supreme Court in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) delineated what seemed to us in *Coward* to be a bright line between the exercise of Congress's Commerce Clause power in criminal cases versus its application in those Acts involving regulation of economic activity. Quoting with approval its statement in *United States v. Lopez,* 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce," *Morrison* stressed that, "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central

---

11. *See, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

to our decision in that case." *Morrison*, 529 U.S. at 610, 120 S.Ct. 1740. *Morrison* then left no doubt that the economic regulatory regime inaugurated in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), remains very much alive:

> *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor.

*Morrison*, 529 U.S. at 611, 120 S.Ct. 1740, citing *Lopez* at 559–60, 115 S.Ct. 1624.[12] *See also Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 1908–09, 146 L.Ed.2d 902 (2000).

As subsection (a)(2)(B) on its face has an interstate commerce jurisdictional element, defendants are reduced to question, as they do, the Congressional findings here, just as the Supreme Court did in *Morrison*, 529 U.S. at 614–16, 120 S.Ct. 1740. Defendants cite two recent law review articles for the proposition that the Congressional "findings" underpinning the RLUIPA were more apparent than real.[13]

Whatever the true percentage of cases in which religious organizations have improperly suffered at the hands of local zoning authorities, we certainly are in no position to quibble with Congress's ultimate judgment that the undeniably low visibility of land regulation decisions may well have worked to undermine the Free Exercise rights of religious organizations around the country. And the mere fact that zoning is traditionally a local matter does not answer Congress's undoubtedly broad authority after *Wickard* to regulate economic activity even when it is primarily intrastate in nature.[14] Nor is this the first time Congress has entered the zoning area. Just six years ago, it adopted the Telecommunications Act of 1996 that at 47 U.S.C. § 332(c)(7)(B) specifically governs state and local authorities passing upon zoning requests of wireless providers without (to date) any judicially-recognized constitutional objection.

■ Thus, insofar as state or local authorities "substantially burden" the economic activity of religious organizations, Congress has ample authority to act under the Commerce Clause. We therefore hold

---

**12.** It is important to note that, as the Supreme Court mentioned in *Morrison*, this continued vitality of *Wickard* includes its principle of the aggregation of effects. *Morrison*, 529 U.S. at 611 n. 4, 120 S.Ct. 1740 ("[I]n every case where we have sustained federal regulation under *Wickard*'s aggregation principle, the regulated activity was of an apparent commercial character."); *accord United States v. Gregg*, 226 F.3d 253, 262 (3d Cir. 2000).

**13.** Ada–Marie Walsh, Note, *Religious Land Use and Institutionalized Persons Act of 2000: Unconstitutional and Unnecessary*, 10 Wm. & Mary Bill Rts. J. 189 (2001); Evan Shapiro, Comment, *The Religious Land Use and Institutionalized Persons Act: An Analysis Under the Commerce Clause*, 76 Wash.L.Rev. 1255 (2001).

**14.** If there were any doubt that Congress had in mind *Wickard*'s aggregation of intrastate effects approach, it is removed in the "Limitation" of § 4(g) of the RLUIPA, which provides:

> (g) LIMITATION.—If the only jurisdictional basis for applying a provision of this Act is a claim that a substantial burden by a government on religious exercise affects, or that removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, the provision shall not apply if the government demonstrates that all substantial burdens on, or the removal of all substantial burdens from, similar religious exercise throughout the Nation would not lead in the aggregate to a substantial effect on commerce with foreign nations, among the several States, or within Indian tribes.

that subsection (a)(2)(B) is a permissible exercise of that broad power.

*"Individualized Assessments"*

■ We come now to the second limiting provision of the RLUIPA that applies to this case, subsection (a)(2)(C), which covers cases where, as here, it is contended that

> the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

No one contests that zoning ordinances must by their nature impose individual assessment regimes. That is to say, land use regulations through zoning codes necessarily involve case-by-case evaluations of the propriety of proposed activity against extant land use regulations. They are, therefore, of necessity different from laws of general applicability which do not admit to exceptions on Free Exercise grounds. *See Smith*, 494 U.S. at 890, 110 S.Ct. 1595.

What Congress manifestly has done in this subsection is to codify the individualized assessments jurisprudence in Free Exercise cases that originated with the Supreme Court's decision in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Sherbert*, the Supreme Court held that South Carolina could not constitutionally withhold unemployment benefits to a member of the Seventh Day Adventist Church "because she would not work on Saturday, the Sabbath Day of her faith." *Id.* at 399, 83 S.Ct. 1790. Since the South Carolina statute permitted "individualized exemptions" based on "good cause", the Supreme Court held that South Carolina could not refuse to accept Ms. Sherbert's religious reason for not working on Saturday as "good

cause" absent a compelling state interest that permitted such denials by the least restrictive means available. As the Court put it, "to condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.* at 406, 83 S.Ct. 1790. *See also Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (reaffirming that strict scrutiny remains the standard of review in an unemployment benefits case involving a religious applicant); *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

After *Smith* was decided, the Supreme Court confirmed that the presence of "individualized assessments" remains of constitutional significance in Free Exercise cases even outside the unemployment compensation arena. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). *Lukumi* involved an ordinance that on its face dealt with animal cruelty, but had as its explicit effect the proscription of ritual killings of animals (such as chickens, pigeons, ducks, guinea pigs and goats) by adherents of the Santeria faith (which is a syncretion of Roman Catholicism and the traditional African religion of the Yoruba people). The ordinance provided for individualized assessments, such as exempting the slaughter of animals "specifically raised for food purposes," but proscribed "sacrifice [of] any animal within the corporate limits of the City of Hialeah". *Id.* at 528, 113 S.Ct. 2217. The Supreme Court looked behind the ordinance's neutral-sounding words and held:

Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt.

*Id.* at 534, 113 S.Ct. 2217. Most to the point here, the Court went on to say,

As we noted in *Smith,* in circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason."

*Id.* at 537, 113 S.Ct. 2217 (quoting *Smith,* 494 U.S. at 884, 110 S.Ct. 1595) (quoting *Bowen v. Roy,* 476 U.S. 693, 708, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)).[15] *Lukumi* concluded by reaffirming that "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Id.* at 546, 113 S.Ct. 2217.

Thus, it should by now be apparent that subsection (a)(2)(C) faithfully codifies the "individual assessments" jurisprudence in the *Sherbert* through *Lukumi* line of cases. It is therefore not constitutionally exceptional.

*Other RLUIPA Codifications*

■ The operative proscriptions of § 2(b) of the statute, quoted in full at the beginning of this Memorandum, also codify existing Supreme Court decisions under the Free Exercise and Establishment Clauses of the First Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment. This is readily seen in the first two subsections of § 2(b), which we restate here:

(b) DISCRIMINATION AND EXCLUSION—

(1) EQUAL TERMS.—No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) NONDISCRIMINATION.—No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

On the face of these two subsections, the echoes of *Lukumi,* just discussed, are unmistakable. *See, e.g., Lukumi* at 543, 113 S.Ct. 2217 ("The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."); *id.* at 542–43, 113 S.Ct. 2217 ("The Free Exercise Clause 'protects religious observers against unequal treatment,' and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.") (internal alterations and citations omitted).

As the Government noted at oral argument, these two subsections also echo our Court of Appeals's decision in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359 (3d Cir.), *cert. denied,* 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999). In that case, our Court of Appeals held, in an opinion by Judge Alito for himself and Judges Greenberg

---

**15.** As Chief Justice Burger put it for the Court in *Roy,* "If a state creates such a mechanism [for individualized exemptions], its refusal to extend an exemption to an instance of religious hardship suggests a discriminat-ing intent." *Id.* *Roy* involved a Free Exercise objection to the statutory requirement that applicants for Aid to Families with Dependent Children benefits must supply their Social Security account numbers.

and McKee, that a Newark police department policy that prohibited officers from wearing beards, but allowed an exception for health reasons, violated the Free Exercise Clause by not allowing an additional exemption for Sunni Muslim officers who wore beards as a matter of their religious obligation. *See id.* at 360–61. This kind of unequal treatment, the Court of Appeals held, "indicates that the [police department] has made a value judgment that secular (*i.e.*, medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity, but that religious motivations are not." *Id.* at 366.

Subsections (b)(1) and (2) are also rooted in Establishment Clause jurisprudence where the Supreme Court has disapproved of unequal treatment of religious activities measured against secular ones. *See Kiryas Joel Village*, 512 U.S. at 704, 114 S.Ct. 2481 (stating that "civil power must be exercised in a manner neutral to religion"); *Zorach v. Clauson*, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (holding that Government may not "prefe[r] those who believe in no religion over those who do believe"). This bar to unequal treatment is, of course, the fundamental point of *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105, which held that the Establishment Clause requires that the "principle or primary effect [of governmental action] must be one that neither advances nor inhibits religion."

As the Supreme Court noted in *Lukumi*, the Equal Protection Clause of the Fourteenth Amendment is often yoked with the Free Exercise Clause. *Lukumi*, 508 U.S. at 540, 113 S.Ct. 2217 ("In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases."). It is well-established that the Equal Protection Clause subjects laws that distinguish on the basis of religion to strict scrutiny. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

Thus, §§ 2(b)(1) and (2) of the RLUIPA are constitutional because they codify existing Free Exercise, Establishment Clause and Equal Protection rights against states and municipalities that treat religious assemblies or institutions "on less than equal terms" than secular institutions or which "discriminate[ ]" against them based on their religious affiliation.

*The RLUIPA's Proscription Against Exclusions and Limitations*

■ It will be recalled that subsection (b)(3) contains two additional proscriptions:

(3) EXCLUSIONS AND LIMITS.—No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

Like the proscriptions just-considered, these two are also rooted in existing Supreme Court jurisprudence.

■ It is, for example, well-established that a municipality cannot entirely exclude a type of conduct that the First Amendment protects. In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the Supreme Court dealt with a zoning ordinance that the New Jersey courts had construed to prohibit "live entertainment" anywhere in Mt. Ephraim. As the ordinance included within its ambit "a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments," 452 U.S. at 65, 101 S.Ct. 2176, the Court held that the ordi-

nance ran afoul of the Constitution. Mt. Ephraim's attempt to justify its ordinance by reference to secondary effects, such as traffic or parking problems, received a sarcastic response from the Court: "We do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant." *Id.,* at 73, 101 S.Ct. 2176.

Most pertinent to our task here, the Court in *Schad* rejected Mt. Ephraim's defense that the ordinance was constitutional because patrons could see nude dancing in other towns. On this point, *Schad* quoted with approval the Court's decision in *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939): "[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad,* 452 U.S. at 76–77, 101 S.Ct. 2176.

The *Schad–Schneider* rule remains firmly established. As the Court wrote in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 54, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), "The First Amendment requires ... that [municipalities] refrain from effectively denying [land users] a reasonable opportunity" to do what the First Amendment protects within their borders.[16] Subsection (3)(A) thus codifies this jurisprudence.

Similarly, the second provision of subsection (b)(3)—proscribing any land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction"—codifies existing Supreme Court Equal Protection jurisprudence under the Fourteenth Amendment. For example, in *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 447–48, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court considered a land use reg-

ulation that required operators of a home for the mentally retarded to get a special use permit in an area that allowed many other uses (such as fraternity or sorority houses, hospitals and nursing homes) to operate as of right. The Court found no rational difference between homes for the mentally retarded and these other permitted uses. *Id.* at 446, 450, 105 S.Ct. 3249. It therefore struck down the ordinance as violative of equal protection. *Id.*

Thus, Congress in subsection (b)(3)(B) did no more than codify settled Supreme Court standards.

*The RLUIPA's "General Rule"*

In their reply memorandum, defendants note that the Government, in essence, "claims that the RLUIPA merely codifies existing law." Reply at 1. They then point out that, if the Government is correct on this point, "then there is no real need for the RLUIPA". *Id.* Specifically, defendants contend that:

> To the extent RLUIPA was devised to codify the First and Fourteenth Amendment protections, Congress already instituted legislation that provides a remedy for violations of those Amendments, namely, the Civil Rights Act, 42 U.S.C. § 1983, et seq. That remedy also provides for attorneys fees and costs pursuant to 42 U.S.C. § 1988. However, codifying existing law is not what RLUIPA actually does, despite the Intervener's arguments to the contrary. What RLUIPA actually does is change the standard by which courts analyze land use cases.

*Id.* at 1–2.

On these points defendants are, in our view, precisely correct. That is to say, the RLUIPA *is* something new under the fed-

---

**16.** *Renton* sustained a zoning ordinance that "sought to make some areas available for adult theaters and their patrons, while at the same time ... preventing those theaters from locating in other areas." *Id.* at 54, 106 S.Ct. 925.

eralism sun. This is so because of the burden-imposing provision of the statute's "general rule", which it may be recalled provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). The question therefore becomes whether defendants are right that the statute

> seeks to statutorily overturn a court interpretation of the Constitution. It seeks to repackage that which the Supreme Court has already held to be an inappropriate use of Congressional power. It is yet another example of Congress exceeding its proper authority.

Reply at 2 (footnotes omitted). The two cases defendants cite, that they claim the RLUIPA *sub silentio* overrules, are *Smith* and *City of Boerne*. As *City of Boerne* disposed of the RLUIPA's predecessor,

the RFRA, we again consider its teaching in some detail.

*The RFRA's Constitutional Infirmities*

As repeatedly noted, *City of Boerne* held that the RFRA exceeded Congress's enforcement powers under § 5 of the Fourteenth Amendment.[17] In order to determine whether the RLUIPA is consistent with *City of Boerne*, we first look to Justice Kennedy's consideration of Congress's remedial powers, as they relate to the states, under § 5 of the Fourteenth Amendment.[18]

Throughout his Opinion for the Court, Justice Kennedy was at pains to make a distinction between Congress's "power to remedy" and the Court's power to define constitutional rights and "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). As Justice Kennedy put it in *City of Boerne*,

> Congress' power under § 5, however, extends only to "enforcing" the provisions of the Fourteenth Amendment ... The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the

> every right guaranteed by the Due Process Clause of the Fourteenth Amendment")....

*City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157.

**17.** It is important to stress, however, that Congress has undoubted power to enforce the Religion Clauses of the First Amendment. As the Court put it in *City of Boerne* itself,

> Congress' power to enforce the Free Exercise Clause flows from our holding in *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), that the "fundamental concept of liberty embodied in [the Fourteenth Amendment's Due Process Clause] embraces the liberties guaranteed by the First Amendment." See also *United States v. Price*, 383 U.S. 787, 789, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) (there is "no doubt of the power of Congress to enforce by appropriate criminal sanction

**18.** As Justice Scalia did not join Part III–A–1 of Justice Kennedy's Opinion for the Court, see *City of Boerne*, 521 U.S. at 507, note *, 117 S.Ct. 2157, there was no Opinion of the Court regarding the Fourteenth Amendment's history as a remedial, rather than substantive, constitutional source of Congressional authority. We therefore confine our analysis to that portion of Justice Kennedy's opinion that commanded the support of five Members of the Court.

Clause. Congress does not enforce a constitutional right by changing what the right is.

*Id.* at 519, 117 S.Ct. 2157.

This is, to be sure, a crucial difference going back to *Marbury.* If Congress could by statute redefine the content of constitutional provisions, *Marbury*'s distinction between the Constitution as "superior paramount law" and "ordinary legislative acts" would be obliterated. *See Marbury,* 5 U.S. (1 Cranch) at 177, 2 L.Ed. 60, *quoted in City of Boerne,* 521 U.S. at 529, 117 S.Ct. 2157. Thus, as Justice Kennedy trenchantly stated it, "any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law." *Id.* at 527, 117 S.Ct. 2157.

The Court recognized that the distinction it was making based upon *Marbury* hardly supplied a bright line for courts to apply; in Justice Kennedy's words,

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect.

*Id.* at 519–20, 117 S.Ct. 2157.

The fatal flaw with the RFRA was, in the Majority's view, that the statute "appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532, 117 S.Ct. 2157. Quoting from the *Civil Rights Cases,* 109 U.S. 3, 13, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the Court noted that "[r]emedial legislation under § 5 'should be adapted to the mischief and wrong which the [Fourteenth] Amendment was intended to provide against.'" *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157. The Court noted that, by contrast, the

> RFRA is not so confined. Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter.

*Id.*

With respect to *Smith,* the Court in *City of Boerne* noted that "[l]aws valid under *Smith* would fall under RFRA without regard to whether they had the object of stifling or punishing free exercise." *Id.* at 534, 117 S.Ct. 2157. "Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of religion." *Id.* at 534–35, 117 S.Ct. 2157.

It is precisely at this point that the RLUIPA critically differs from the RFRA. In limiting its applicability outside of the Spending and Commerce Clauses to those cases where governments make "individual assessments", the statute draws the very line *Smith* itself drew when it distinguished neutral laws of general applicability from those "where the State has in place a system of individual exemptions," but nevertheless "refuse[s] to extend that system to cases of 'religious hardship'", *Smith,* 494 U.S. at 884, 110 S.Ct. 1595. The RLUIPA thus cannot be regarded as in any way hostile to *Smith,* as the RFRA undoubtedly was.

Nor is the RLUIPA hostile to *City of Boerne.* Far from having the "sweeping coverage" of the RFRA that ensured that statute's "intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter", *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157, the RLUIPA here is targeted solely to low visibility decisions with the obvious—and,

for Congress, unacceptable—concomitant risk of idiosyncratic application.

Further, since, as we have demonstrated, the RLUIPA's limitations and proscriptions codify firmly-established Supreme Court rights under its Free Exercise and Equal Protection jurisprudence, it does not "attempt a substantive change in constitutional protections", *id.*, that came to constitutional grief in *City of Boerne.* The new statute thus honors *Marbury*'s distinction between the Constitution as "superior paramount law" and "ordinary legislative acts".

To the extent that, conceivably, the RLUIPA may cover a particular case that is not on all fours with an existing Supreme Court decision, it nevertheless constitutes the kind of congruent and, above all, proportional remedy Congress is empowered to adopt under § 5 of the Fourteenth Amendment. Indeed, as the Supreme Court noted four years after *City of Boerne,* "Congress is not limited to mere legislative repetition of this Court's constitutional jurisprudence," but may also prohibit " 'a somewhat broader swath of conduct.' " *Bd. of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), (quoting *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). And thus, unlike the RFRA, the RLUIPA does not "contradict[ ] vital principles necessary to maintain separation of powers and the federal balance," *City of Boerne,* 521 U.S. at 536, 117 S.Ct. 2157.

Regarding this "federal balance", we do not agree with the Government that the RLUIPA is, at most, a minimalist step that does little more than restate § 1983. It in fact places a statutory thumb on the side of religious free exercise in zoning cases. It likely will open the door to municipalities facing federal litigation in cases that were heretofore customarily considered in state court.[19] But as localities and states long ago became accustomed to defending themselves in federal court under § 1983, and for the past half dozen years have done so with the many cell phone towers that dot the landscape, so they will now with land use decisions that substantially burden religious free exercise. As the RLUIPA is as narrowly drawn as the Telecommunications Act was, we do not believe the new statute unduly offends the federal structure.

We therefore conclude that the RLUIPA's land use provisions are constitutional on their face as applied to states and municipalities.

*Interlocutory Review*

At the April 26, 2002 oral argument, all parties agreed that the question of the RLUIPA's constitutionality constitutes a "controlling question of law" within the meaning of 28 U.S.C. § 1292(b).[20] Plaintiffs also agreed at this argument that the

---

**19.** Although § 4(a) of the RLUIPA contemplates dual jurisdiction, § 4(d), adding actions under the statute to the fee-shifting of 42 U.S.C. § 1988(b), assures that these cases will all be filed in federal court.

**20.** This statute provides,

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

*Id.*

particularized language of the RLUIPA largely supplants what they seek under 42 U.S.C. § 1983 and the Pennsylvania Constitution. Indeed, without formally judging the question, it is hard to imagine how these other legal standards would provide additional protection to plaintiffs if appellate review confirms that the RLUIPA passes constitutional muster.

There is also "substantial ground for difference of opinion" on this question. *City of Boerne* itself was a five-to-four decision, and its application to a new statute, and one explicitly enacted in *City of Boerne*'s wake, is fraught with uncertainty. As noted, this appears to be the first case under the RLUIPA dealing with the constitutionality of its land use provisions, and as of this writing there is no appellate word at all on the propriety of this new and important law in this common setting.

As just noted, all parties agree that the RLUIPA is at the heart of this case. Given the centrality of the RLUIPA here, an immediate appeal from our accompanying Order will therefore likely "materially advance the ultimate termination of litigation."

It would appear from their statements that all interested parties will within ten days file their petitions for review in accordance with § 1292(b). The question of whether the Court of Appeals will accept such an interlocutory appeal is, of course, statutorily entrusted to "its discretion".

*Other Claims*

In addition to challenging the constitutionality of RLUIPA, defendants advance other arguments addressed to the legal sufficiency of the complaint. These contentions may be disposed of swiftly.

Defendants claim that Counts V, VII, IX, XI, and XIII do not properly plead constitutional causes of action under 42 U.S.C. § 1983. "Section 1983 of 42 U.S.C.

does not create substantive rights, but provides a remedy for the violation of rights created by federal law." *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995) (footnote omitted). Since by enacting § 1983 Congress created a remedy for violation of constitutional rights by state and local officials, most courts have held that one cannot sue state and local officials for violation of the constitution of its own force. One must state a claim under § 1983. *See, e.g., Chatterjee v. Sch. Dist. of Philadelphia,* 170 F.Supp.2d 509, 517 (E.D.Pa.2001); *Smith v. Sch. Dist. of Philadelphia,* 112 F.Supp.2d 417, 430 (E.D.Pa.2000).

To plead a proper § 1983 claim, plaintiffs must allege sufficient facts to show or permit the inference of (1) a violation of a federal right (2) by a person acting under color of state law. *Groman,* 47 F.3d at 633. Plaintiffs' complaint fairly puts defendants on notice of both of these essential elements. For each of these five counts, the complaint alleges a constitutional violation, rooted in the facts pleaded in the complaint. Each of the counts in question prominently uses the banner heading, "42 U.S.C. § 1983". Although it is true the complaint does not incant "under color of state law," it alleges that defendants are the Township of Middletown, the Township of Middletown Planning Commission, the Zoning Officer, and other local officials, who allegedly played a part in denying plaintiffs the land use they sought under local law. Given those allegations about these defendants' public offices, the complaint suffices to plead enough state action at this procedural juncture. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993) (stating that the plaintiff must "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist").[21]

---

**21.** This case therefore does not involve the

sometimes vexing question of what constitutes

Defendants also interpose affirmative defenses of official immunity. They assert qualified immunity with respect to the Zoning Officer, members of the Planning Commission, and members of the Township Council. They also claim that the members of the Zoning Hearing Board are entitled to "quasi-judicial" absolute immunity under state law. We need not now reach these affirmative defenses.

Plaintiffs represent that they wish to withdraw their claims against the human defendants in their individual capacities, leaving only the claims against these defendants in their official capacities necessary to support their requests for injunctive relief. *See* Pl'ffs' Mem. of Law at 25. We will incorporate plaintiffs' concession in our accompanying Order.

### ORDER

AND NOW, this 8th day of May, 2002, upon consideration of defendants' motion to dismiss the complaint, and plaintiffs' response thereto, and the intervener Government memorandum of law in support of the constitutionality of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), and defendants' reply thereto, and after argument and further briefing, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is DENIED as to Counts I, II, III and IV, and in all other respects except as to plaintiffs' claims against the natural person defendants, as to which the motion is GRANTED AS UNOPPOSED as to all claims against such defendants in their individual capacities; and

2. This Court being of the opinion that the foregoing Order, insofar as it pertains to the constitutionality of the RLUIPA,

involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the Order as to the RLUIPA may materially advance the ultimate termination of this litigation, hereby CERTIFIES the following question to the United States Court of Appeals for the Third Circuit:

As applied to states and municipalities in cases involving land use, is the Religious Land Use and Institutionalized Persons Act of 2000 a valid exercise of Congress's authority under the Commerce Clause of art. I, § 8, cl. 3 of the Constitution and of the Free Exercise and Free Speech Clauses of the First Amendment thereof, as applied to the states and enforced through § 5 of the Fourteenth Amendment?

"state action" that recently occupied our Court of Appeals in *Crissman v. Dover Downs* *Entm't, Inc.,* 289 F.3d 231 (3d Cir.2002) (*en banc* ).