Continuous and uninterrupted "**border**" between first and section portions.

VENTURA COUNTY CHRISTIAN HIGH SCHOOL, Dan Misenheimer, William Bays, Bret Bays, Lisa Darby Plaintiffs,

v.

CITY OF SAN BUENAVENTURA, City of San Buenaventura Planning Division, City of San Buenaventura City Council, and Does 1–50, inclusive, in their individual and official capacities as agents of the City of San Buenaventura, Defendants.

No. CV–02–08379 CAS.

United States District Court, C.D. California, Western Division.

Nov. 27, 2002.

Nicholas P. Miller, Frank John Broccolo, Sidley, Austin, Brown & Wood, Los Angeles, CA, Daniel J. Carobini, Engle & Bride, Ventura, CA, for plaintiffs.

Jeffrey T. Melching, John A. Ramirez, Rutan & Tucker, Costa Mesa, CA, for defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

SNYDER, District Judge.

### I. INTRODUCTION

On October 30, 2002, plaintiffs Ventura County Christian High School ("Ventura Christian"), Dan Misenheimer, William Bays, Bret Bays, and Lisa Darby filed a complaint for damages, injunctive and declaratory relief against the City of San Buenaventura (the "City"), the City of San Buenaventura Planning Division, the City of San Buenaventura City Council, and Does 1–50. Plaintiffs allege that, on account of plaintiffs' religion, defendants have wrongfully interfered with their ability to install and use certain modular classrooms on property currently leased to the plaintiffs. In the complaint, plaintiffs allege the following claims: (1) violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.;* (2) interference with plaintiffs' right to free exercise of religion, in violation of the First and Fourteenth Amendments to the United States Constitution; (3) interference with plaintiffs' freedom of association rights, in violation of the First and Fourteenth Amendments to the United States Constitution; (4) interference with plaintiffs' freedom of association rights, in violation of Article I, Section 3 of the California Constitution; (5) interference with plaintiffs' equal protection rights, in violation of the Fourteenth Amendment of the United States Constitution; (6) violation of plaintiffs' equal protection rights under Article 1, Section 7 of the California Constitution; (7) violation of plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution; (8) violation of plaintiffs' due process rights, in violation of Article I, Sections 2 and 5 of the California Constitution; (9) interference with plaintiffs' right to religious education, in violation of the United States Constitution; (10) granting of privileges or immunities on unequal terms, in violation of Article I, Section 7(b) of the California Constitution; and (11) judicial review in accordance with California Code of Civil Procedure section 1094.5.

On November 4, 2002, plaintiffs filed a motion for a preliminary injunction, requesting that the Court enjoin the "City and its employees from interfering with Plaintiff's efforts in preparing and using the modular units on Washington School property, and other uses of that property that have been or are approved by the Ventura County School District." Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction at 2.

The Court heard oral argument on November 25, 2002, and thereafter took the matter under submission.

### II. FACTUAL BACKGROUND

Ventura Christian is a college preparatory school that teaches religious doctrine and values as part of its curriculum and environment. Declaration of Charlotte Mason [1] ("Mason Decl.") at ¶ 3. Since 1997, Ventura Christian has operated in rooms rented from a local church located across the street from Washington High School. *Id.* at ¶ 5. The Washington High School property (the "Property") is owned by the Ventura Unified School District ("VUSD"). *Id.* The Property [2] was vacant when, in October 1999, Ventura Christian leased the Property in order to rehabilitate the school for its own use. *Id.;* Declaration of Lisa Darby [3] ("Darby Decl.") at ¶ 1. Ventura

---

1. Mason is the full time principal/administrator of Ventura Christian.

2. The Property is located at 96 MacMillan Avenue, Ventura, California.

3. Darby is a member of the Ventura Christian school board.

Christian contends that it intended to install modular classroom units on the land for use while the larger physical plant of the Property was restored.

Prior to leasing the Property, Ventura Christian alleges that its representatives were informed by VUSD that any "building use projects were to be reviewed by the School District's plant and facility authorities." Mason Decl. at ¶ 5. In accordance with this understanding, Ventura Christian contends that it submitted plans to VUSD to place the modular classrooms on the Property. *Id.* VUSD approved the plans, subsequent to several neighborhood meetings related thereto. Darby Decl. at ¶ 4.

After VUSD approved the plans, Ventura Christian rented five modular classrooms to place on the Property, at a monthly cost of $3,400, in addition to $20,000 installation charges. *Id.* at ¶ 4. After the modular classrooms had been placed on the Property, on October 8, 2001, the City contacted Ventura Christian to inform it that it would need to apply for a City Use Permit ("CUP") within thirty days to proceed with the installations. Mason Decl. at ¶ 6. Ventura Christian alleges that it informed the City that "its understanding had always been that only the School District need approve building and use projects and that no mention of a City CUP had previously been indicated as necessary." *Id.* Fur-

ther, Ventura Christian states that several other private groups erected modular units on nine or ten other locations owned by VUSD, without being required to obtain a CUP. Declaration of Daniel Carobini[4] ("Carobini Decl.") at ¶¶ 2–5.[5] Therefore, Ventura Christian asserts that the City had a pattern and practice of allowing private entities to use VUSD land and avail themselves of VUSD's permitting and use processes.

Between December 2001, and February 2002, Ventura Christian allegedly notified the City that several other private groups had been allowed to erect modular units on VUSD land without obtaining or seeking a CUP.[6] Darby Decl. at ¶ 3. Dennis Mackey, a representative of the City's planning department, allegedly responded: "Aren't you a Christian school? Doesn't the Bible say you are supposed to abide by the laws of the land?" *Id.*

Ventura Christian continued to install the modular units until January 28, 2002, when the City issued a stop work order and citation, preventing Ventura Christian from proceeding. Plaintiff's Motion for a Preliminary Injunction ("Pls.' Mot.") at 4. Thereafter, without agreeing to the City's jurisdiction in the matter, Ventura Christian submitted plans to obtain a CUP through the City's pre-application process in early 2002. Ventura Christian characterizes the City's response as "an exten-

---

**4.** Carobini is local counsel for Ventura Christian.

**5.** As an example, Ventura Christian alleges that the City transferred 5,000 square feet of city park property to VUSD to lease to a private child care provider, thereby avoiding the City CUP process. Carobini Decl. at ¶ 4; *id.* at Ex. D, p. 2 ("It was proposed by the Parks Contract and Services Administrator that [the city park property] might be able to be deeded over to the school district. If that could occur, the child care vendor would follow all our regulations in putting a building

on property rather than the city's building restrictions or conditions.").

**6.** For example, plaintiffs allege that a Native American organization was previously allowed to use a building on the Property without "being required to seek use or other permits from the City." Carobini Decl. at ¶ 3. However, when the group's lease expired and Ventura Christian exercised its rights under the lease with VUSD to use the building, the City informed Ventura Christian that it must first obtain a CUP. *Id.*

sive list of arbitrary and burdensome requirements that it would likely require [if] the school were to submit an actual application." Carobini Decl. at ¶ 6.[7]

Ventura Christian alleges that in the Summer of 2002 it was told by the City that if it submitted an application for a CUP, the City would "compromise on some of the more onerous requirements, including the modular unit set-back [described in footnote 5]." *Id.* at ¶ 7. Ventura Christian filed said application in October 2002, while allegedly indicating to the City that time was of the essence due to the financial strain of "paying two rents, and from the loss of enrollment" due to delay. *Id.* at ¶¶ 7–8. The City responded by a letter dated October 31, 2002, in which the City concluded that Ventura Christian's CUP application was incomplete. *Id.* at ¶ 9, at Ex. H. Further, Ventura Christian asserts that the City allegedly reneged on the aforementioned compromises. *Id.*

As a result of the delays described above, Ventura Christian alleges that it has suffered significant harm. Specifically, Ventura Christian claims that the school's enrollment has dropped from 90 students to 54 students "in great part by the cut-backs in programs and classes and the lowered morale caused by the continued delay in moving out of the present and inadequate and cramped facilities." Mason Decl. at ¶ 9. Further, Ventura Christian has been paying "double rent," as it must continue to pay for its existing facility, as well as the vacant modular units. *Id.* Ventura Christian alleges that its declining enrollment has resulted in lost tuition revenue that has led to the termi-

nation of many educational programs at the school. Mason Decl. at ¶ 8. Additionally, Ventura Christian contends that, without an actual school campus, many of its students will not be able to have a true "high school" experience. *Id.*

Ventura Christian argues that it will suffer irreparable harm unless the Court issues a preliminary injunction ordering the City to cease and desist from stopping the installation or use of the modular units. Ventura Christian alleges that it will be unable to recruit new students, and it will have to continue to pay "double rent," which will bankrupt the school. Mason Decl. at ¶ 10. Specifically, Ventura Christian contends that if it does not "gain access to its modular classrooms in the next month, in time to be ready for the new semester, it will have to either close its doors, or so severely curtail its operations as to be an unrecognizable and radically different entity." *Id.* at 11. The "make or break date" cited by Ventura Christian is December 5, 2002, since that is when the rent is due for its present facilities. Mason Decl. at ¶ 12.

The City responds that it has made numerous efforts to work with Ventura Christian to complete the various CUP materials from December 2001, until June 2002. Declaration of Dennis Mackay[8] ("Mackay Decl.") at ¶ 4–15. Further, the City contends that the CUP application submitted by Ventura Christian on September 19, 2002, was incomplete, due in large part to Ventura Christian's cancellation of certain pre-application meetings scheduled with the City. *Id.* at ¶ 14. The City also claims that all entities, religious

---

7. One requirement imposes a 25 foot setback from the property line, which would require Ventura Christian to move any already-installed modular units. Carobini Decl. at ¶ 6. Carobini declares that this is an "inexplicable requirement, as the legal set-back requirement on the land was 15 feet, and the modu-

lars were in line with the existing buildings on the property." *Id.*

8. Mackay is a planning manager with the Planning Division of the Community Development Department of the City of San Buenaventura.

and non-religious, that are subject to the City's zoning code must obtain CUP's.[9] *Id.* at ¶ 20. Additionally, the City asserts that any entities who are currently using VUSD property without a CUP have been doing so without the knowledge of the City.[10] *Id.* at ¶ 25.

## III. STANDARD

A preliminary injunction is appropriate when the moving party shows either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in the moving party's favor. *See Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). These are not two distinct tests, but rather "the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.' " *Id.* A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984).

## IV. DISCUSSION

### A. Success on the Merits

Plaintiffs present a variety of arguments as to why they will likely succeed on the merits of their claims under RLUIPA, the United States Constitution, and the California Constitution, since defendants alleg-edly have placed plaintiffs on less than equal terms with non-religious organizations. Plaintiffs have grouped their claims into two categories: (1) defendants' application of the City's zoning laws discriminates against plaintiffs by placing them on less than equal terms with non-religious organizations; (2) defendants' actions violate plaintiffs' right to religious freedom. The Court addresses these arguments below.

### 1. Equal Protection Claims

RLUIPA section 2(b)(1) provides:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b)(1). "The purpose of this section is to forbid governments from prohibiting religious assembly uses while allowing equivalent, and often more intensive, non-religious assembly uses." Roman P. Storzer & and Anthony R. Picarello, Jr., *The Religious Land Use and Institutionalized Persons Act of 2000: A Constitutional Response to Unconstitutional Zoning Practices,* 9 Geo. Mason L.Rev. 929, 968 (2001). Section 2(b) of RLUIPA codifies "existing Supreme Court decisions under the Free Exercise and Establishment Clauses of the First Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment." *Freedom Baptist Church v. Twp. of Middletown,* 204 F.Supp.2d 857, 869 (E.D.Pa.2002).[11] Therefore, in

---

**9.** The City provides exhibits of CUP's issued to churches and private religious schools of various religious faiths. *See* Mackay Decl., Exs. K–Z.

**10.** Specifically, the City denies that it had knowledge of "the establishment of any temporary American Indian use at any public schools." *Id.* at 25.

**11.** RLUIPA, which became effective on September 22, 2000, was adopted in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488, in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See Freedom Baptist Church,* 204 F.Supp.2d at 860. RFRA and RLUIPA were enacted to rescind *Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (*see infra*), and to restore the "compelling interest/least restrictive means" standard articulated in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,*

evaluating plaintiffs claims under either RLUIPA or the Equal Protection Clause of the Fourteenth Amendment, the Court must first inquire as to whether defendants have treated plaintiffs in an unequal manner to similarly situated entities. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ("The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike."); *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120 (3d. Cir.2002) ("[T]he initial burden [is] on the complaining party first to demonstrate that it is similarly situated to an entity that it is being treated differently before the local municipality must offer a justification for its ordinance.") (citations and quotations omitted).

a. Arguments of the Parties [12]

Plaintiffs contend that they have been put on "less than equal terms" with several private, non-religious institutions that have been able to erect modular units similar to those of Western Christian, without obtaining a CUP. Pls.' Mot. at 14. Plaintiffs point to the following language of a letter dated October 14, 1997, from Joseph Richards, Jr.[13] to Greg Gilmer[14] regarding a property exchange between VUSD and the City:

> The Ventura Unified School District and City administrative staff met to discuss the possibility of the City deeding a portion of land to the District. The land would be used to house a portable classroom structure on the site by a Day Care Vender. The vendor would follow all of the school district's regulations in placing a building on the property rather than the City's building restrictions or conditions.

Carobini Decl. Ex. E. Plaintiffs contend that this letter is evidence of a property exchange between the City and VUSD to allow "a private day-care to avoid City building permit requirements by locating on School District land." Carobini Decl. ¶¶ 4-5, Exs. D-F; Second Declaration of Daniel Carobini ("Second Carobini Decl.") at ¶ 11. Plaintiffs assert that this is just one example of the City's policy "to allow private entities on School District land to avail itself [sic] of the permitting and use process used by public schools themselves," thereby avoiding the compliance with City building restrictions or conditions. Pls.' Mot. at 3.

As another example, plaintiffs point to a memorandum from Dr. Arlene Miro[15] that concerns a meeting with City personnel regarding the erection of modular unit by a child care vendor. According to the memorandum, Dr. Miro identified the following "problem" and "solution":

> *Problem:*
> Many of our school plants and grounds are crowded or will be crowded with

---

406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), that applied when a plaintiff challenged the application of neutral, generally applicable laws to religious practices. *See Murphy v. Zoning Comm'n*, 148 F.Supp.2d 173, 184 n. 6 (D.Conn.2001).

**12.** The Court notes that the plaintiffs do not claim that the City's zoning requirements are a "substantial burden" on their religious exercise, in violation of RLUIPA section 2(a)(1). Plaintiffs' Reply to Defendants' Opposition ("Reply") at 13.

**13.** The Assistant Superintendent of Business Service with VUSD at the time of the above letter.

**14.** The Parks Contract & Services Administrator for the City at the time of the above letter.

**15.** At the time of the memorandum, Dr. Miro was employed by VUSD in Elementary Instructional Support Services.

portables that will be placed on the premises this summer. There would be very little space to place a child care portable (bought by the vendor) on particular school sites. Specifically, the Blanche Reynolds child care vendor, Las Posas, will be looking for a place to put a portable building for afterschool care. There are 80 children in the program which presently uses [sic] the school cafeteria. They also have a waiting list of children who desire to be in the program.

*Solution:*

Blanche Reynolds school abuts a city park. The land directly behind the church ... would be an ideal spot for the location on a portable for child care. In researching the area, it was proposed by the Parks Contract and Services Administrator that this section of land might be able to be deeded over to the school district. If that could occur, the child care vendor would follow all our regulations in putting a building on property rather than the city's building restrictions or conditions.

Carobini Decl. at Ex. D. Plaintiffs contend that the City has likewise turned a blind eye to eight other modular units that have been erected, used, and operated by private entities without obtaining a CUP permit. Darby Decl. at ¶ 5 (giving the names, addresses, and private affiliations of ten child care facilities).

Defendants respond that the City requires "all proposed land uses (religious and non-religious alike) that are subject to the City's CUP process to comply with that process." Defendants' Opposition to Plaintiffs' Motion ("Defs.' Opp.") at 5–6. With regard to the ten examples given by plaintiffs of private entities using modular units on VUSD land, the City contends that it has issued CUP's for eight of them. *Id.* at 15 n. 6. Further, of the two that do not possess CUP's, the City argues that plaintiffs have not established sufficient evidence that the City was aware of the alleged private use of the school facilities. *Id.* (citing *United States v. Fares,* 978 F.2d 52, 60 (2d Cir.1992) (holding that a claim for selective prosecution lacked merit because the defendant did not provide evidence of "similarly situated persons known to the government who had not been prosecuted.")).

Plaintiffs "do not dispute that permission was obtained, at least in some instances, ... to run day-care businesses on property that had been previously used for educational purposes." Reply at 3.[16] However, plaintiffs assert that the CUP's in question are not building permits, but instead are only conditional permits to use the school property for day-care. Plain-

---

**16.** Plaintiffs contend that they are not required to obtain a CUP for Ventura Christian merely to use the vacant Washington School grounds, since they only seek to continue "to use existing school land as a school." Reply at 2. To support this contention, plaintiffs rely on a letter dated October 8, 2001, from Marion Thompson to VUSD regarding Ventura Christian's use of the Property:

The City's Planning Division has received information that the Ventura County Christian High School operating at Washington School located at 65 S. McMillian Avenue has added modular structures to the site. Zoning Ordinance Section 24.218.030 requires a school use to obtain a Use Permit prior to initiating, expanding or changing. A private school operation, even when operated on property owned by the Ventura Unified School District, is not exempt from City zoning regulations.

A Use Permit was not required when the current operation commenced because it was considered a continuation of the previous school use. However, now that additional structures have been brought on site, it is necessary to file for and obtain a Use Permit....

Second Carobini Decl. at Ex. A.

tiffs assert that the CUP's obtained by the private entities "did not serve as permits for zoning, building, or design review that would allow the placement of the modular units." Therefore, plaintiffs maintain that the properties in question never obtained CUP's for the placement and installation of their modular units, and since the City is requiring Ventura Christian to obtain a CUP to build their modular units, they are on less than equal terms than similarly situated private, secular entities. *Id.* at 3–4.

### b. Analysis

■ The rationale behind a CUP, such as the one at issue in this case, is "to regulate certain use types that would not be appropriate throughout a given zoning district but that, if controlled as to number, area, location, relation to the neighborhood, or other relevant factors, would not be in conflict with the purposes of [the City's] zoning ordinance[s]." City of San Buenaventura Zoning Ordinance ("Zoning Ordinance") § 24.520.010. VUSD must abide by the City's zoning ordinances unless "the governing board ... by a vote of two-thirds of its members, [renders] a city or county zoning ordinance inapplicable to a proposed use of property by such school district." Cal. Gov.Code § 53094. However, regardless of section 53094, VUSD or any other entity must comply with any City ordinances:

> (1) regulating drainage improvements and conditions, (2) regulating road improvements and conditions, or (3) requiring the review and approval of grading plans as these ordinance provisions relate to the design and construction of onsite improvements which affect drainage, road conditions, or grading ....

Cal. Govt.Code § 53097.

Although plaintiffs contend that VUSD approved their plans for the installation of the modular units, they have not provided the Court with evidence that VUSD made the requisite two-thirds vote necessary to render the City's zoning ordinances (and presumably the CUP process) inapplicable. *See* Cal. Gov.Code § 53094.[17] Therefore, Ventura Christian must abide by the City's zoning ordinances in order to erect modular units on the Property.[18]

An examination of the CUP's issued to other private entities who have built modular units on VUSD property does not indicate that the plaintiffs have been placed on "less than equal terms" than said entities. The City has provided the Court with a

---

**17.** Nevertheless, even if such a vote had been made, plaintiffs would have to abide by any ordinance provisions relating to "drainage, road conditions, or grading." Cal. Govt.Code § 53097. Defendants contend that plaintiffs have not followed the necessary procedures required to obtain a City grading permit. *See* Declaration of Frank Nelson ("Nelson Decl.") at ¶¶ 4–8 (Nelson is an Associate Civil Engineer in the Land Development Engineering Section of the Community Development Department of the City). Further, defendants argue that plaintiffs' failure to adhere to said ordinances could prove to be hazardous to the surrounding residential neighborhood. *Id.* at ¶ 8; *see infra* at 17–18.

**18.** It appears that, without erecting different facilities (i.e. the modular units), Ventura

Christian's use of the Property may be a continuation of an existing use, and therefore would not require a CUP. *See* Second Carobini Decl. at Ex. A. However, when plaintiffs chose to install modular units on the Property, this was an expansion of their use of the Property, thereby requiring a CUP. *See* Zoning Ordinance § 24.218.030; Second Carobini Decl. at Ex. A ("Zoning Ordinance Section 24.218.030 requires a school use to obtain a Use Permit prior to initiating, expanding or changing."); Zoning Ordinance § 24.520.010 ("The use permits procedure is intended to regulate certain use types that would not be appropriate throughout a given zoning district but that, if controlled as to number, area, location, relation to the neighborhood, or other relevant factors, would not be in conflict with the purposes of this zoning ordinance.").

number of CUP's that it has issued to secular and religious entities for the construction of various structures, including modular units on VUSD property. This evidence directly contradicts plaintiffs' allegation that "several other private groups had erected modular units on leased school district land at least eight different locations, and had not been required to seek a[CUP] to do so." Complaint at ¶ 4.

In their reply brief plaintiffs allege that, despite the CUP's described above, the "private day-care centers never sought, and never obtained, building and zoning permits for the actual placement or building of the modular units, which is what the City is requiring of plaintiffs." Reply at 4. For example, it appears that a CUP typically only gives conditional approval for the erection of a structure such as a modular unit. The entity seeking to build the modular unit must also obtain "zoning and related permits," as well as "[a]ll required building and grading permits" before the City will grant "final building inspection clearance." *See, e.g.,* Mackay Decl. at Ex. EE (CUP for "operation of a children's day-center at Poinsettia Elementary School"). Plaintiffs contend that the City has not produced evidence (despite requests from Carobini) which indicates that any of the private entities have obtained the requisite zoning, building, or grading permits required by the CUP's. Reply at 4. Therefore, plaintiffs argue that they have been treated in a discriminatory manner by the City, since they are required to obtain further requisite permits (in addition to a CUP) for the installation of their modular units.

It appears that plaintiffs are attempting to change their argument in their reply brief. The complaint alleges that Ventura

Christian was treated in a discriminatory manner by the City, since it was required to "submit to the permitting process," while other private groups were allowed to build modular units without being "required to seek a use permit to do so." Complaint at ¶¶ 4–5; *see also id.* at ¶ 11 ("Plaintiffs allege that the City of Ventura and the Defendants treat private religious schools, including Ventura Christian, on equal terms as compared with private nonreligious schools or day care centers and other secular community groups. This unequal treatment is seen in the policy and practice that a private religious school, Ventura Christian, must obtain a use permit from the City to install and use modular classrooms, but that private day care centers and other community groups need not seek such a permit."); *id.* at ¶ 42 ("The actions of the Defendants in forcing Ventura Christian to apply for a CUP were arbitrary, capricious and an abuse of discretion in violation of state law."). Further, in their reply brief, plaintiffs maintain that they are objecting to "the City's decision to apply the zoning regulations to Plaintiffs discriminatorily in the first place." Reply at 8. Therefore, it seems that the plaintiffs' complaint is that the City has subjected them to the CUP process itself—not that Ventura Christian has been discriminated against in being required to obtain certain permits following the receipt of a CUP.[19] Therefore, whether or not some of the CUP's in question expired at some later date is irrelevant to the Court's inquiry here.

In light of the above, plaintiffs do not appear to be very likely to succeed on the merits of their claims, as the evidence does not indicate that they have been placed on "less than equal terms" with secular enti-

---

**19.** Further, plaintiffs have neither obtained a CUP, nor a CUP denial. The private institutions to which plaintiffs compare Ventura Christian have all obtained CUP's. Therefore,

in order for plaintiffs to be similarly situated to these institutions, they would first be required to obtain a CUP as a prerequisite to such a claim.

ties in the City.[20] Defendants have presented evidence that eight of the ten private entities who have built modular units on VUSD property were required to, and did obtain CUP's. *See generally* Mackay Decl. & Exs. attached thereto. Further, in regard to the two transactions in which private entities allegedly have availed themselves of VUSD zoning regulations without the use of CUP's,[21] the Court finds that there is insufficient evidence for it to conclude that the City has placed Ventura Christian on unequal footing with these entities. In those two situations, the VUSD may have availed itself of its ability to, "by a vote of two-thirds of its members, [render] a city or county zoning ordinance inapplicable to a proposed use of property by the school district." Cal. Gov.Code § 53094. In the present case, plaintiffs have neither alleged nor presented evidence that VUSD has done likewise for their construction endeavor.

2. Religious Freedom

■ Plaintiffs also contend that they are likely to succeed on the merits of their claims that defendants have violated their right to religious exercise under the California and United States Constitutions. *See* Pls.' Mot. at 17–19. The Court considers these arguments below.

a. Freedom of Religious Exercise Under the United States Constitution

"The right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or pro-

scribes)." *Employment Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (internal quotations and citations omitted). Therefore, a court generally analyzes "a free exercise of religion claim under a rational basis test." *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir.1999). However, the Supreme Court has held that a "hybrid" claim, in which a law "involves not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections," would require a strict scrutiny standard of review. *Smith*, 494 U.S. at 881–82, 110 S.Ct. 1595. Plaintiffs argue that their claims involve "hybrid" Constitutional rights, including the right to freedom of religious exercise, "freedom of association, and the right to equal protection of the laws and due process." Pls.' Mot. at 18.

However, in order to assert a "hybrid-rights claim, 'a free exercise plaintiff must make out a "colorable claim" that a companion right has been violated—that is, a "fair probability" or a "likelihood," but not a certitude, of success on the merits.'" *Miller*, 176 F.3d at 1207 (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 165 F.3d 692, 707 (9th Cir.1999)). The Court concluded *supra* that plaintiffs have not presented adequate evidence for the Court to find that they have been treated unequally under the law. Further, plaintiffs have not provided the Court with authority that indicates that a neutrally-enforced zoning ordinance may violate the Constitutional right to freedom of association under the First Amendment. Therefore, the Court concludes that this is not a "hybrid-rights claim," and strict scrutiny would be inappropriately applied here.[22]

**20.** Further, it is not clear that a private high school is similarly situated with a day care facility at an elementary school. As the City pointed out at oral argument, due to the former's teenage student population, a private high school may have drastically different impacts than a day care facility on traffic and other neighborhood concerns.

**21.** *See supra* at 1246–48.

**22.** Likewise, plaintiffs would have an uphill battle to establish that a facially-neutral zon-

**b.  Freedom of Religious Exercise Under the California Constitution**

■  Under the California Constitution, "Free Exercise and enjoyment of religion without discrimination or preference are guaranteed."  Cal. Const.  Art I, sec. 4. This provision has been interpreted by California courts to mean the following:

> [T]he preference clause seeks to prevent government from giving any advantage to religion in California.  The relevant inquiry is whether government has granted a benefit to a religion or religion in general that is not granted to society at large.  Once government bestows that differential benefit on religion, it has acted unconstitutionally in this state. By the same token, the law cannot discriminate against religious institutions; this means, in the context of the County zoning scheme, that they are entitled to be considered on the same basis as other community-enhancing uses and facilities when it comes to land use decisions.

*Lucas Valley Homeowners Assn. v. County of Marin,* 233 Cal.App.3d 130, 145, 284 Cal.Rptr. 427 (1991) (internal quotations and citations omitted).  As discussed *supra,* the Court has found that it is unlikely that plaintiffs will succeed on the merits of their equal protection claims.  For similar reasons, the Court concludes that it is unlikely that plaintiffs will establish that defendants have discriminated against plaintiffs' enjoyment of religion, in violation of the California Constitution.

**B.  Hardship to the Parties**

■  Plaintiffs claim that unless this Court issues a preliminary injunction to stop defendants from interfering with the construction of the modular units, plaintiffs will suffer irreparable harm.  The crux of this contention is that Ventura Christian will be unable to recruit new students and it will have to continue to pay "double rent," which will bankrupt the school by December 2002.  Mason Decl. at ¶ 10.

However, when the public interest may be implicated by a preliminary injunction, "courts of equity may, and frequently do, go much farther to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."  *United States v. First Nat'l City Bank,* 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).  According to the Ninth Circuit, "when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."  *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir.1989).

Plaintiffs claim that if the Court were to grant them a preliminary injunction in this case, it would further the public interest. First, plaintiffs contend that the public interest is supported by the policy underlying RLUIPA, since " 'Congress conclusively determined [in passing RLUIPA that] the national public policy that religious land uses are to be guarded from interference by local governments to the maximum extent permitted by the Constitution.' "  Reply at 21–22 (quoting *Cottonwood Christian Ctr. v. Cypress Redvlpmt. Agency,* 218 F.Supp.2d 1203, 1230–31 (C.D.Cal.2002)).  However, since the Court has concluded that plaintiffs are unlikely to prove that defendants have violated

---

ing ordinance does not pass the less-cumbersome, rational basis test.  *See Christian Gospel Church, Inc. v. City and Cty. of San Francisco,* 896 F.2d 1221, 1225 (9th Cir. 1990) ("Since the zoning scheme does not implicate a suspect class or a fundamental right, the appropriate question for this equal protection analysis is whether or not the provision is rationally related to a permissible state objective.... [the City and County] have a legitimate interest in preserving the welfare and character of its neighborhoods.").

RLUIPA, this argument is unpersuasive. Further, plaintiffs assert that a preliminary injunction will "serve the public interest by promoting private education," since "it frees up tax money for the public schools by removing students from crowded public school classrooms." Reply at 22. Assuming that this latter argument is indeed valid, the Court nevertheless finds that there is a greater likelihood that the public interest will be harmed by a preliminary injunction in this case.

On September 12, 2002, Frank Nelson, a civil engineer who currently works for the City, performed a "site inspection" of the Property, and made the following observations regarding the installation of the modular units:

> Earth materials were moved from the high side to the low side and this created steep slopes next to the back yards of the homes [nearby]; grading and drainage devices to [sic] not appear to have been engineered, checked, permitted or inspected and as a result; and I see no storm water treatment devices at all. The existing drainage devices that appear to have been in place since before the grading was done do not appear to have been properly maintained.

Nelson Decl. at ¶ 7. Further, the City argues that plaintiffs' "outright refusal to comply with the City's permitting process preluded the completion of even an initial study, much less any subsequent analysis based on the results of that study," to ensure that the erection of the modular

units has complied with the California Environmental Quality Act ("CEQA"), Cal. Pub. Res.Code § 21000 *et seq. See* Cal. Pub. Res.Code § 21080.1 ("The lead agency shall be responsible for determining whether an environmental impact report, a negative declaration, or a mitigated negative declaration shall be required for any project which is subject to this division. That determination shall be final and conclusive on all persons, including responsible agencies, unless challenged as provided in Section 21167."); 14 Cal.Code of Regs. § 15063 ("Following preliminary review, the lead agency shall conduct an initial study to determine if the project may have a significant effect on the environment.").[23]

While plaintiffs have presented evidence of irreparable injury, it seems that their financial peril is due in part to their own failure to obtain a judicial determination of their rights and obligations at some earlier point in time. *See Caplan v. Fellheimer Eichen Braverman & Kaskey,* 68 F.3d 828, 839 (3d Cir.1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable."). Nevertheless, in balancing the public environmental and regulatory interests in this case against the plaintiffs' somewhat self-inflicted financial crisis, the Court determines that "the public interest should receive the greater weight." *World Wide Factors,* 882 F.2d at 347. The City has presented evidence that the modular unit construction at the Property may not be in compliance with the City's drainage and grading codes,[24] which poses a threat

**23.** In enacting CEQA, the California legislature declared that "it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." Cal. Pub. Res.Code § 21002. CEQA applies to "to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment

and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits, and the approval of tentative subdivision maps unless the project is exempt from this division." *Id.* at § 21080(a).

**24.** As discussed in footnote 17 *supra,* even the VUSD cannot avoid compliance with the City's grading and drainage codes.

of damage to neighbors adjoining the Property. Further, if the Court were to grant a preliminary injunction in this case, the City will be unable to ensure that its drainage and grading codes are enforced, and will likewise be unable to regulate the environmental impact of the construction at the Property.

In summary, plaintiffs have not presented adequate evidence that they are likely to succeed on the merits of their claims to warrant a preliminary injunction. Additionally, while plaintiffs may indeed suffer irreparable injury, the Court finds that the public interest against granting a preliminary injunction outweighs the plaintiffs' interest in an injunction being granted.[25]

## V. CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

---

**25.** At oral argument, plaintiffs asserted that the allegedly hazardous conditions at the Property will remain if a preliminary injunction does not issue in this case. Therefore, plaintiffs argue, the public interest weighs in their favor, since a preliminary injunction will allow them to continue construction and correct any alleged hazardous conditions. However, while the plaintiffs may be correct that construction of the modular units may be delayed until Ventura Christian obtains a CUP, if the Court were to grant the relief requested by plaintiffs, namely to enjoin the City from "interfering with Plaintiff's efforts in preparing and using the modular units," the City would be without the power to regulate and otherwise supervise the construction at the Property. The Court trusts that, if a current environmental hazard exists on the Property, the City will take the appropriate steps to remedy the situation. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("[T]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities.").